UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM DYE,

              Petitioner,

    vs.

RON BARNES, Warden,

              Respondent.

No. 12-cv-2201-TLN-EFB P

FINDINGS & RECOMMENDATIONS

Petitioner is a state prisoner proceeding through counsel with a second amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction entered against him on September 29, 2009, in the Butte County Superior Court on charges of attempted second degree murder with use of a firearm. He seeks federal habeas relief on the following grounds: (1) his trial and appellate counsel rendered ineffective assistance; (2) prosecutorial misconduct violated his right to due process; and (3) jury instruction error violated his federal constitutional rights. Petitioner has also filed a motion for a stay of this action so that he can "exhaust evidence in support of facts" underlying his claims of prosecutorial misconduct. ECF No. 82 at 1. For the reasons that follow, it is recommended that petitioner's motion for a stay be denied and petitioner's habeas petition be denied in its entirety.

/////

/////

1

1  **I. Background**

2    In its unpublished memorandum and opinion affirming petitioner's judgment of

3  conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

4  following factual summary:

5    A jury convicted defendant William Robert Dye of attempted
6  murder (Pen.Code, §§ 187, subd. (a), 664),FN1 and found that he
  personally and intentionally discharged a firearm causing great
7  bodily injury (§ 12022.53, subd. (d)).  The trial court found that he
  committed the offense while released on bail or [sic] his own
8  recognizance (§ 12022.1), and that he had served four prior prison
  terms (§ 667.5, subd. (b)).  Defendant was sentenced to state prison
9  for a determinate term of 15 years plus a consecutive indeterminate
  term of 25 years to life.  He was also sentenced to two consecutive
10 terms in the case underlying the on-bail enhancement.

11   FN1. Further undesignated statutory references are to the Penal
  Code.

12   On appeal, defendant contends (1) the jury instructions on
  attempted murder were erroneous as a matter of law, (2) the trial
13 court erroneously denied his request for a jury instruction on
  attempted voluntary manslaughter, and (3) he is entitled to an
14 additional day of presentence custody credit; the Attorney General
  concedes this last point.  We shall modify the judgment.

15
16   **FACTS**

17   **Prosecution Case–in–Chief**

18   On the evening of August 31, 2007, a party was held at a Chico
  motel.  Present were defendant, Christopher Johns, Johns's
19 girlfriend Christy Scarbrough, Lena Forbes, Chris Smith, and
  Smith's girlfriend Antonia Taylor.  Alcohol and methamphetamine
20 were consumed.

21   When the methamphetamine began to run out, Forbes suggested
  that they buy more from victim Donnie Powell, Jr. (Powell Jr.),
22 who lived nearby.  Forbes and Taylor went to Powell Jr.'s
  apartment where Forbes purchased a quarter ounce of
23 methamphetamine for about $300.  After about 45 minutes, Forbes
  and Taylor returned to the party and shared methamphetamine with
24 defendant, Johns, Scarbrough, and Smith.  Then the
  methamphetamine ran out.

25   Forbes believed that Powell Jr. had access to a large amount of
  methamphetamine and could furnish more to the group.  Johns
26 suggested to defendant that Powell Jr. could furnish more
  methamphetamine.

27

28

        2

Defendant asked to borrow Forbes's car. She watched as defendant, Johns, and Scarbrough left together in her (Forbes's) car. Defendant was driving.

On the evening of the party, Donnie Powell III was staying with his father, Powell Jr., at his Chico apartment. Powell III was on the living room couch. Powell Jr. and his girlfriend, Teresa Spohr, were in the bedroom watching television, talking, and dozing off. The bedroom door was closed.

Late in the evening, Scarbrough arrived at Powell Jr.'s apartment and knocked on the door. Powell III looked through the peephole and saw Scarbrough, whom he recognized as a family friend. Powell III opened the door and saw that she was accompanied by defendant and Johns, whom he did not know. The trio entered the apartment. Scarbrough wanted to see Powell Jr. Powell III knocked on Powell Jr.'s door and told him that Scarbrough was there. Powell Jr. said, "[w]e're busy," so Powell III returned to the living room.

According to Powell III, the trio went to Powell Jr.'s bedroom door and knocked on it; Scarbrough believed that only defendant and Johns approached the door. Scarbrough sat next to Powell III on the couch and talked to him while defendant and Johns sought entry to the bedroom.

Powell III told Scarbrough that the men were going to make his dad mad; Scarbrough replied, "[w]ell, they're mad," which prompted Powell III to observe the two men.FN2   In an ensuing police interview, Scarbrough said her words had been, "Doesn't matter, they're pissed already." However, she had not known that anything was about to happen.

FN2.  Johns testified that he was not angry at Powell Jr., and had no ill feelings toward Powell Jr., who essentially was helping him out; they were not on bad terms. Johns was not aware of any hard feelings defendant may have had toward Powell Jr.

Spohr testified that someone kept knocking on the bedroom door approximately every two seconds, causing Spohr to become irritated and upset. After 45 to 90 seconds, she got up and opened the door, revealing two men she had never seen before. When Powell Jr. saw the two men, he jumped out of the bed and stood next to it. Johns testified that Powell Jr. and Spohr were acting nervous, as if they had been caught having an affair. Johns entered the room, nicely put his hand on Spohr's chest, pushed her back almost to her side of the bed, and told her that she needed to leave. Johns explained that he wanted Spohr to leave because he did not know her and did not want to talk about drugs in front of her; however, she did not leave.

Powell III saw Johns walk to the bedroom doorway and stand there while defendant stood behind Johns in the hallway. After hearing the sound of a punch, Powell III ran down the hall and glanced between defendant and Johns to check on his father. Powell III

3

made eye contact with Powell Jr., whose expression suggested that things were okay. Then Powell III returned to the living room and sat with Scarbrough on the couch. He continued to look down the hall to make sure his father was okay.

Spohr testified that the other man (defendant) entered the bedroom, almost immediately pulled a black eight-inch revolver from his waistband, and shot Powell Jr. in the face as Powell Jr. tried to duck. Powell III similarly testified that the shorter, thinner man (defendant) reached into his waistband and pulled out a gun; then Powell III heard a pop. Powell III ran toward his father as the two men fled out the front door. Spohr telephoned 911.

Scarbrough testified that she heard the loud pop, so she panicked and left with defendant and Johns. Eventually, they returned to the motel.

Ninety to 120 minutes after seeing them depart, Forbes saw defendant, Johns, and Scarbrough return to the motel and enter the party room, one after another. Defendant returned the car keys to Forbes. She did not recall anything unusual about how defendant was acting; he was quiet and his usual, easygoing self.

Johns and Scarbrough left the motel alone and walked to Scarbrough's nearby home, where others were present. The police showed up and arrested them. At an in-field showup, Spohr identified Johns as the unarmed man who had pushed her backward. Spohr testified that Scarbrough, whom she knew, was next to Johns.

Scarbrough identified defendant as the third person who had been with her and Johns. Johns selected defendant's photograph from an array. At trial, Johns identified defendant as the person depicted in the photograph he had selected.

Following the shooting, Smith and Taylor drove defendant and his "wife," Rachel Gale, from Chico to the Paradise residence of Thomas Devlin, who was a friend of Smith. Officers detained Smith and Taylor as they were leaving Devlin's residence. At the officers' request, defendant eventually stepped out of the Devlin residence.

**Defense**

Defendant presented a defense of alibi and third party culpability. Jody Mattis, a friend of Johns, testified that Powell Jr. was shot by a member of Johns's family and not by defendant.

Connie Swanson, defendant's estranged wife, testified that she had attended the party and had talked with defendant outside the motel for 20 minutes after Johns and Scarbrough drove away. Afterward, Swanson reentered the party room and defendant walked toward the parking lot. He returned to the motel room approximately one hour later, which was "way before" Johns and Scarbrough returned.

4

1
2
3
4
5
6
7
8

> Taylor testified that she and Smith, her then friend and now husband, rented the motel room for the night and invited defendant, Johns, Scarbrough, and Forbes for a party. Swanson was present. Johns and Scarbrough left the party when Forbes lent them her car. Thereafter, Taylor and defendant took Smith to a hospital emergency room because Smith had an infection in his chin. Hours later, defendant drove Taylor from the hospital back to the motel. About that time, Johns and Scarbrough arrived back at the motel; then Johns and Scarbrough left. Defendant remained at the party a few more hours, until he and Smith left together.
>
> Smith confirmed that defendant and Taylor took him to the hospital. When Smith left the hospital, he saw defendant and assumed that defendant had been there the entire time waiting for him.

9 *People v. Dye*, No. C063503, 2011 WL 856424, **1 -3 (Cal.App. 3 Dist. Mar. 11,2011).

10       After the California Court of Appeal affirmed petitioner's judgment of conviction, he filed

11 a petition for review in the California Supreme Court, raising the same two jury instruction claims

12 that he had raised on direct appeal. Resp't's Lodg. Doc. 5. The Supreme Court summarily

13 denied review. Resp't's Lodg. Doc. 6.

14       Subsequently, on February 27, 2012, petition filed a petition for writ of habeas corpus in

15 the California Superior Court, in which he claimed that his trial and appellate counsel rendered

16 ineffective assistance, the prosecutor committed misconduct, and the trial court's denial of his

17 discovery motion violated his right to a fair trial. Resp't's Lodg. Doc. 7. On February 29, 2012,

18 the Superior Court denied that petition on the ground that petitioner's vague, unsupported, and

19 conclusory allegations were insufficient to allow for intelligent consideration of the issues which

20 petitioner had attempted to raise. Resp't's Lodg. Doc. 8.

21       On April 25, 2013, petitioner filed a petition for writ of habeas corpus in the California

22 Supreme Court. ECF No. 79 at 12-125. Therein, he claimed that: (1) the prosecutor committed

23 misconduct pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) in failing to disclose

24 consideration given to Johns in exchange for his trial testimony; (2) the prosecutor committed

25 misconduct pursuant to *Napue v. Illinois*, 360 U.S. 264 (1959) in failing to correct Johns'

26 knowingly false testimony that he was not promised a benefit in exchange for his trial testimony;

27 and (3) his trial counsel rendered ineffective assistance in failing to call Detective Terry Moore

28 /////

1    and petitioner's first trial counsel Grady Davis as trial witnesses.  *Id.*  By order dated June 26,

2    2013, that petition was summarily denied.  *Id.* at 11.

3        Petitioner filed his first federal habeas petition in this court on August 23, 2012.  ECF No.

4    1.  Therein, he claimed that: (1) the trial court violated his right to due process in failing to

5    instruct the jury on attempted voluntary manslaughter; (2) the jury instruction on second degree

6    murder was erroneous and violated his right to due process; and (3) his trial counsel rendered

7    ineffective assistance in: (a) conceding there was no evidence of "heat of passion" to support the

8    jury instruction on attempted voluntary manslaughter; (b) failing to object to statements made by

9    the prosecutor to the effect that implied malice could support a conviction for second degree

10    murder; and (c) failing to call attorney Grady Davis as a trial witness.

11        After the answer was filed, petitioner filed a motion to stay and abey these proceedings in

12    order to fully exhaust in state court his claim that his trial counsel rendered ineffective assistance.

13    ECF No. 19.  He also filed a supplemental letter and a request for discovery.  ECF No. 26.  After

14    several extensions of time, on June 20, 2013, respondent filed an opposition to petitioner's motion

15    for stay and abeyance.  ECF No. 33.  By order dated August 15, 2013, petitioner's motion for a

16    stay was denied without prejudice.  ECF No. 38.

17        On August 6, 2013, petitioner filed a 190 page first amended petition for a writ of habeas

18    corpus.  ECF No. 36.  Therein, petitioner modified the third claim contained in his originally filed

19    petition and added the following additional claims: (1) his trial counsel rendered ineffective

20    assistance in failing to request a jury instruction on attempted voluntary manslaughter, failing to

21    call attorney Grady Davis and Detective Terry Moore as trial witnesses, failing to impeach

22    Christopher Johns, and failing to show that Johns was lying when he testified he was not

23    promised anything in exchange for his trial testimony; (2) the prosecution committed a *Brady*

24    violation in failing to disclose evidence of an agreement by the prosecution to help Johns in his

25    pending criminal case in exchange for his trial testimony; and (3) the prosecutor used knowingly

26    false testimony when she allowed Johns to testify that he had not received any promises in

27    exchange for his trial testimony.

28    /////

On August 15, 2013, this court appointed counsel for petitioner.  In a subsequently filed status report, petitioner's trial counsel informed the court that he intended to file a second amended habeas petition in order to combine all of petitioner's claims into one petition.  ECF No. 47.  Counsel also stated that he intended to request that the second amended petition be stayed pending exhaustion of state remedies.  *Id.*  On March 28, 2014, petitioner filed a second amended petition.  Therein, he raises the following claims, in the following order: (1) his trial counsel rendered ineffective assistance in failing to impeach Mr. Johns with evidence that he had received a promise of consideration from the prosecution in return for his testimony against petitioner (designated claim 1(a)); (2) the prosecution violated its obligation under *Brady* in failing to disclose that it had promised consideration to Johns in return for his trial testimony (claim 1(b)); (3) the prosecutor violated his constitutional rights in falsely telling the trial court that she was unaware of a cooperation agreement between the prosecution and Johns, and violated her obligation under *Napue* by eliciting testimony from Johns that he had not been promised anything in exchange for his trial testimony (claim 1(c)); (4) the prosecution violated its obligations under *Brady* in failing to turn over to the defense exculpatory evidence regarding the promises of consideration offered to Johns in exchange for his trial testimony (claim 1(d)); (5) his appellate counsel rendered ineffective assistance in failing to challenge on direct appeal the trial court's erroneous evidentiary rulings that had the effect of unduly restricting trial counsel's cross-examination of Johns, in violation of his rights under the Confrontation Clause and his right to present a defense (claim 1(e)); (6) his trial counsel rendered ineffective assistance in failing to call attorney Grady Davis as a trial witness (claim 1(f)); (7) his trial counsel rendered ineffective assistance in failing to call Detective Terry Moore as a trial witness (claim 1(g)); (8) the trial court's failure to instruct the jury on attempted voluntary manslaughter violated his right to due process and the effective assistance of counsel (claim 2); and (9) the trial court's erroneous jury instruction on second degree murder violated his rights to due process and trial by jury (claim 3).  By order dated April 2, 2014, the undersigned ordered respondent to file a response to petitioner's second amended petition within 60 days.  ECF No. 58.

/////

On July 23, 2014, respondent filed a motion to dismiss claims 1(a), (b), (c), (d), (e), and (g) as barred by the one-year statute of limitations contained in 28 U.S.C. § 2244(d).  ECF No. 63.  Respondent argued that these claims, which were raised only in the first and second amended petitions, did not "relate back" to the originally filed petition and were therefore untimely.  *Id.* at 3.  Petitioner filed an opposition to that motion on October 22, 2014.  ECF No. 71.  On November 6, 2014, respondent filed a document withdrawing his motion to dismiss, stating that the "issue of timeliness is best raised, if at all, on a claim-by-claim basis in an answer."  ECF No. 75 at 1.

By order dated November 10, 2014, this court acknowledged respondent's withdrawal of the motion to dismiss and directed respondent to file an answer to the second amended petition within sixty days.  ECF No. 76.  Respondent filed an answer on February 2, 2015 and petitioner filed a traverse on April 3, 2015.  ECF Nos. 80, 81.

On April 6, 2015, petitioner filed another motion for a stay of this action.  ECF No. 82.  That motion is addressed below along with the merits of the habeas petition.

## II.  Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8

1    For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

2    holdings of the United States Supreme Court at the time of the last reasoned state court decision.

3    *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

4    ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.

5    Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

6    what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*,

7    633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

8    precedent may not be "used to refine or sharpen a general principle of Supreme Court

9    jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  *Marshall*

10   *v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155

11   (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so

12   widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

13   be accepted as correct.  *Id.*  Further, where courts of appeals have diverged in their treatment of

14   an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

15   *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

16   A state court decision is "contrary to" clearly established federal law if it applies a rule

17   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

18   precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

19   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

20   writ if the state court identifies the correct governing legal principle from the Supreme Court's

21   decisions, but unreasonably applies that principle to the facts of the prisoner's case. [1] *Lockyer v.*

22   *Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002

23   (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

24   court concludes in its independent judgment that the relevant state-court decision applied clearly

25   established federal law erroneously or incorrectly.  Rather, that application must also be

26   _____

27   [1]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be
overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
presented in the state court proceeding."  *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,

28   384 F.3d 628, 638 (9th Cir. 2004)).

1    unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473

2    (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

3    review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

4    "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

5    'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v.*

6    *Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

7    Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

8    must show that the state court's ruling on the claim being presented in federal court was so

9    lacking in justification that there was an error well understood and comprehended in existing law

10   beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

11       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

12   court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

13   527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

14   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

15   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

16   de novo the constitutional issues raised.").

17       The court looks to the last reasoned state court decision as the basis for the state court

18   judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If

19   the last reasoned state court decision adopts or substantially incorporates the reasoning from a

20   previous state court decision, this court may consider both decisions to ascertain the reasoning of

21   the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

22   a federal claim has been presented to a state court and the state court has denied relief, it may be

23   presumed that the state court adjudicated the claim on the merits in the absence of any indication

24   or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99.  This presumption

25   may be overcome by a showing "there is reason to think some other explanation for the state

26   court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

27   /////

28   /////

1    Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

2    expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

3    the federal claim was adjudicated on the merits.  *Johnson v. Williams*, ___ U.S. ___, ___, 133

4    S.Ct. 1088, 1091 (2013).

5           Where the state court reaches a decision on the merits but provides no reasoning to

6    support its conclusion, a federal habeas court independently reviews the record to determine

7    whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

8    *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

9    review of the constitutional issue, but rather, the only method by which we can determine whether

10   a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.  Where no

11   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

12   reasonable basis for the state court to deny relief."  *Richter*, 562 U.S. at 98.

13          A summary denial is presumed to be a denial on the merits of the petitioner's claims.

14   *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

15   just what the state court did when it issued a summary denial, the federal court must review the

16   state court record to determine whether there was any "reasonable basis for the state court to deny

17   relief."  *Richter*, 562 U.S. at 98.  This court "must determine what arguments or theories ... could

18   have supported, the state court's decision; and then it must ask whether it is possible fairminded

19   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

20   decision of [the Supreme] Court."  *Id.* at 786.  The petitioner bears "the burden to demonstrate

21   that 'there was no reasonable basis for the state court to deny relief.'"  *Walker v. Martel*, 709 F.3d

22   925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

23          When it is clear, however, that a state court has not reached the merits of a petitioner's

24   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

25   habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

26   F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

27   /////

28   /////

**III.  Petitioner's Claims**[2]

  **A.  Ineffective Assistance of Trial and Appellate Counsel/Prosecutorial Misconduct**

   As set forth above, petitioner claims that his trial counsel rendered ineffective assistance in: (1) failing to "competently" impeach Johns with evidence that he had received a promise of consideration from the prosecution in exchange for his testimony against petitioner; (2) failing to call Grady Davis as a witness to rebut Johns' allegations that Davis asked him to "lie on the stand;" and (3) failing to call Detective Moore as a witness to testify that "promises of consideration were made to Mr. Johns in return for his cooperation and testimony against petitioner."  ECF No. 56 at 11-12, 17, 28, 59, 60.  Petitioner also claims that his appellate counsel rendered ineffective assistance in failing to challenge on direct appeal the "trial court's erroneous rulings that unduly restricted trial counsel's cross-examination of Mr. Johns."  *Id.* at 11, 44-58. Petitioner further claims that the prosecutor committed misconduct in: (1) failing to disclose that it had "made a cooperation agreement with Mr. Johns in return for his testimony;" (2) soliciting "perjurious testimony from Mr. Johns in which he denied having received any promise of consideration in return for his testimony against petitioner;" and (3) failing to turn over exculpatory evidence relating to the promises of consideration offered to Mr. Johns.  *Id.* at 11. Petitioner explains that all of these claims "concern errors relating to impeachment of the credibility of Mr. Johns' testimony."  *Id.*

   After setting forth pertinent background facts and the applicable legal standards, this court will address petitioner's claims of ineffective assistance of counsel and prosecutorial misconduct below.

/////

---

  [2]  Respondent argues that some of petitioner's claims are unexhausted and barred as untimely.  ECF No. 80 at 13, 41-47.  Because AEDPA's statute of limitations is not jurisdictional, *see Green v. White*, 223 F.3d 1001, 1003-04 (9th Cir. 2000), the court elects to deny petitioner's habeas petition on the merits rather than reach the statute of limitations issues.  Further, even assuming arguendo that some of petitioner's claims were not exhausted in state court, this court will recommend that all of petitioner's habeas claims be denied on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

1             **1. Background**

2             **a. Johns' Interrogation**

3         Christopher Johns was interrogated by Detective Moore shortly after he was arrested.

4   ECF No. 56-5 at 1-28.  At the beginning of the interrogation, Johns stated that he had been out of

5   prison on parole since June.  *Id.*  He explained that he had also been in prison before, that he had

6   one "strike," and that he wasn't sure whether he had two "strikes."  *Id.* at 3.  Detective Moore

7   stated that if petitioner had "two strikes and were to get another felony of any kind, um, then

8   that's what you've got to be careful about."  *Id.* at 4.

9         Detective Moore asked Johns whether he was interested in talking about what had

10  happened.  Johns responded, "it depends."  *Id.*  Johns then asked "what kind of cop" Moore was.

11  *Id.* at 6.  Moore stated that he was "a detective."  *Id.*  Moore also told Johns that he was "fair" and

12  that "if I tell you that I can do something for you, I can do it."  *Id.* at 7.

13        Detective Moore told Johns he was going to ask him some questions about the shooting at

14  Powell's apartment.  *Id.* at 9.  He stated that, although Johns was not the shooter, Johns did not

15  want to get "caught up" in the crime "in light of what's going on with your record."  *Id.*  Moore

16  stated, "so what I'm telling you is that I'll work with you as much as I can."  *Id.*  Moore told

17  Johns that he was "not in a great position."  *Id.* at 10.  He stated,

18            but later on, someone is going to ask me if you get convicted or
          plead guilty to something behind this case, even if it's a small thing,

19            um, and what I think should happen to you. . . .  The questions are
          the same every time.  What was your attitude when you got taken

20            into custody?   Do I know of any prior contacts with law
          enforcement?  What do I think you ought to get sentenced to?

21

22  *Id.*

23        Moore also advised Johns of "the three things that I require for a decent referral from me

24  when the case is all over," such as Johns' attitude, cooperation, and honesty.  *Id.*  He explained

25  that sometime in the future he would have to tell "somebody – a judge, probation officer, and the

26  DA –  How did Chris respond?"  *Id.* at 11.  Moore stated that if Johns was honest with him, he

27  would do his best to get Johns the best possible sentence in this case because he knew Johns was

28  /////

1   not the shooter. *Id.* at 12.  Moore stated that his recommendation was "the pivotal key in you

2   getting consideration." *Id.* at 20.

3       Johns asked Moore whether he was a "high up detective." *Id.*  He asked if Moore knew

4   "some of the DA's over there." *Id.*  Moore told Johns he could

5           show you "where you can get you most best chance at – at a deal.
            And it's here today now.  It's not – it's not with a DA later.  It's
6           me.  I mean me and my partner have this investigation.  They don't
            get the case until we send it to them.  They don't even know about
7           it until we send it to them.

8   *Id.* at 21.

9       Johns expressed fear of petitioner's "bad friends" and of being released back into the same

10  community. *Id.* at 21-22.  He also expressed concern about Scarbrough's safety. *Id.* at 21.  He

11  asked whether he had to testify in court. *Id.* at 23.  He also asked what would happen to him. *Id.*

12  at 24.  Moore offered some opinions but told Johns there were "no guarantees of any kind." *Id.*

13  Shortly thereafter, Johns told Moore that the person who went with him and Scarbrough to

14  Powell's apartment was petitioner "William Dye." *Id.* at 27.

15                          **b.  The Confidential Report**

16      The "confidential report" is a police narrative authored by Officer S. Harris.  ECF No. 56-

17  6.  Officer Harris relates that on March 4, 2009, nearly two years after the shooting at Powell's

18  apartment and approximately six months prior to the start of petitioner's trial, he and Detective

19  Moore spoke with Christopher Johns at the Butte County Jail. *Id.* at 1.  Johns was then in custody

20  from a drug related arrest. *Id.*  Harris noted in the report that Johns was a witness to the shooting

21  of Powell, and that petitioner was arrested for that shooting and was in custody awaiting trial. *Id.*

22      Officer Harris related in the report that, prior to Johns' arrest, Harris had been

23  communicating with Johns by telephone about petitioner's upcoming trial. *Id.*  Johns wanted to

24  know what to expect during the trial and he expressed concern "about his testimony due to future

25  retaliation." *Id.*  Johns requested that Harris and Deputy District Attorney (DDA) Corie Caraway

26  (the prosecutor at petitioner's trial) meet with him "to talk about a separate issue." *Id.*

27  /////

28  /////

To that end, Detective Moore, Officer Harris, and DDA Caraway arrived at the Sheriff's office on March 4 to speak with Johns. *Id.* at 2. Detective Moore was invited because he had established a rapport with Johns during the 2007 police interrogation. *Id.*

Johns told Harris that Grady Davis, petitioner's then counsel, had asked him and Scarbrough not to testify against petitioner. He stated that Davis told them to "change our story and lie on the stand" or to "take off out of state." *Id.* Johns stated he would be willing to "wear a wire and have a conversation with Grady Davis at his office." *Id.* at 3.

Harris "reminded Johns that [he] had been in contact with his parole agent about getting him moved out of Butte County" after he testified at petitioner's trial. *Id.* Harris then left the interview room. Harris told Detective Moore and DDA Caraway, who were waiting outside the interview room, that "Johns was alleging that Grady Davis was intimidating him and Christy Scarbrough and had asked them both to lie or change their testimony." *Id.*

Detective Moore and DDA Caraway then entered the interview room to speak with Johns. *Id.* Johns told Moore and Caraway about Grady Davis' attempts to induce him and Scarbrough to implicate someone other than petitioner for the shooting or to leave town so they didn't have to testify. *Id.* at 4. Johns stated that Davis also told him to say that he "lied" during his initial police interrogation when he stated that petitioner shot Powell. *Id.*

Detective Moore asked Johns if he was considering "doing what Grady Davis was asking him to do." *Id.* at 7. Johns said that he wasn't and that petitioner was "putting him [Grady] up to it." *Id.* Johns stated that "if he (Johns) testifies to something different than his original statement he would be lying." *Id.*

Johns told Moore and Caraway that he would be in danger of retaliation after he testified at petitioner's trial and that he needed "to be moved to somewhere out of state." *Id.* at 5. Johns "asked who had the power to get his parole hold dropped" because he wanted to get released from the Butte County Jail. *Id.* at 6. Detective Moore told Johns he "would talk with parole but gave no promises." *Id.*

Detective Moore also "talked to Johns about his current criminal case." *Id.* at 7. Johns "admitted that he wants to cooperate with BINTF while this case was pending" and "that's why

15

he was trying to get released from jail." *Id.*  Johns stated he had "already contacted a Detective with BINTF." *Id.*  Moore told Johns that "he probably needed to deal with his current case before parole would release the hold." *Id.*

Detective Moore told Johns that the information he had relayed about Grady Davis was "sensitive" and that he would "look into it." *Id.*  Johns stated that he did not want anyone to know what he had told Moore and Caraway about Davis. *Id.*  Moore told Johns the information would remain private. *Id.*

At this point Officer Harris re-entered the room and asked Johns about "what he had heard about the shooting since he has been in custody." *Id.*  Johns relayed some information he had heard about the shooting from another inmate. Johns told Harris that he saw petitioner walk into Powell's bedroom, remove a gun from the front of his waistband, and shoot Powell. *Id.* at 8-9. He then described what happened after the shooting. *Id.* at 9.

The confidential report then goes on to state the following:

> We thanked Johns for his time and told him that we would be in contact with him.  I did ask Johns if Grady Davis has talked with Christy Scarbrough.  Johns said that they have talked but he told Christy not tell [sic] anyone about what she and Grady Davis discussed.  Johns remembered Grady Davis telling him that he did not want this to go trial [sic] because "someone stands to get hurt." Johns was not concerned about getting hurt until after he testified. Johns said that he was the only person who was going to testify that petitioner "pulled the trigger."  No other witness can testify to that other than him.  He added that after he testified, he would lose everything around here and would not be able to come back for a long time.  The interview was concluded.

*Id.*  The confidential report was attached to petitioner's habeas petition filed in the California Supreme Court.  ECF No. 79 at 102-11.

At the time of the meeting described in the confidential report, Johns was in custody after having been arrested for possession and sale of a controlled substance.  He was not charged with a third strike in that matter, even though he had two prior strike convictions.  After the March meeting with Detective Moore and the prosecutor, memorialized in the confidential report, Johns' parole hold was lifted, his bail was vacated, and he was released on his own recognizance.  ECF No. 56-9.  On November 5, 2009, shortly after petitioner's trial had concluded, Johns pleaded

1    guilty to simple possession of a controlled substance with no priors.  ECF No. 56-14.  On January

2    28, 2010, Johns was sentenced to straight probation.  ECF No. 56 at 20, 26; *see also* ECF No. 56-

3    7.  At the sentencing hearing, Johns' attorney told the court that "counsel and I worked closely on

4    a negotiated disposition and a resolution of this case."  ECF No. 56-10.  The prosecutor then

5    explained that "this is an unusual case" and "there are reasons that it is unusual involving a jury

6    trial."  ECF No. 56 at 26.

7            Johns was subsequently convicted of a misdemeanor for testing positive for drugs.  ECF

8    No. 56-11.  At the sentencing hearing on that matter, Johns' counsel asked for leniency for Johns.

9    He stated, "given the fact that he essentially put his life in jeopardy to testify in the case that I

10   referenced in my brief, and his life is still in jeopardy, as a consequence of that, we should give

11   [Johns] one more chance on probation."  ECF No. 56-12 at 2.  The prosecutor responded, "It's

12   best not to try to sell the same car to the same person twice."  *Id.*  The court replied, "I understand

13   the statement by the District Attorney."

14                          **c.  Pre-Trial Matters**

15           Petitioner's initial trial counsel was Grady Davis.  As discussed in more detail below, Mr.

16   Davis withdrew from representing petitioner after he (Davis) concluded that he had a potential

17   conflict of interest.  Thereafter, petitioner was represented by Arturo Marquez.

18           During the time that Mr. Davis was representing petitioner, he filed a discovery motion

19   requesting, among other things, "any and all" offers or promises made by the prosecution "to any

20   witnesses to obtain information or testimony."  Clerk's Transcript on Appeal (CT) at 63.  In a

21   declaration submitted in support of petitioner's California Supreme Court habeas petition, Davis

22   stated, in pertinent part, that:

23                   At the time of my declaring conflict of interest, I had filed pretrial
                 discovery motions, including what I considered to be "Brady"
24               material.  Specifically, I believed that Christopher A. Johns had
                 been working with "law enforcement" to obtain leniency in
25               connection with charges pending against him.   Furthermore I
                 believed that Christy Scarbrough had also been given leniency and
26               consideration for her cases.

27   ECF No. 79 at 113.

28   /////

                                          17

The discovery motion filed by Mr. Davis was apparently dropped from the trial court's calendar after Davis withdrew as petitioner's trial counsel. Reporter's Transcript (RT) at 54. However, at a subsequent pretrial hearing at which Arturo Marquez appeared for petitioner, Marquez informed the trial court that the discovery motion was still outstanding and had never been ruled on. *Id.* Mr. Marquez explained that he wanted the court to rule on the discovery motion even though he was "personally satisfied that there probably is not anything that could be provided to me (regarding a promise of leniency to trial witnesses) that she (the prosecutor) is aware of." *Id.* at 54-55.

Mr. Marquez informed the court that Mr. Johns had a pending criminal case. *Id.* at 55, 57. The following discussion then occurred:

> MR. MARQUEZ: . . . And there is some indication that he may have made a special arrangement with the People that has not been disclosed to me. I have no information upon which to base that. I've discussed that with Counsel, she's stated to me that there is no special arrangements, that there is no special consideration given to Mr. Johns.
>
> THE COURT: None that she's aware of.
>
> MR. MARQUEZ: None that she's made aware of yet.
>
> MS. CARAWAY (the prosecutor): I'm not sure I would be made aware of.
>
> THE COURT: I don't think the prosecution would be made aware of that.
>
> MS. CARAWAY: I've actually been intentionally kept away from that case.
>
> THE COURT: Would not be included in the reports received from law enforcement either.
>
> So, generally, you're free to cross-examine Mr. Johns and any of the officers that he's dealt with if they are also witnesses in the case . . .
>
> MR. MARQUEZ: Sure.
>
> THE COURT: . . . as to whether any consideration has been offered for his testimony.
>
> The People wouldn't object to that?

18

MS. CARAWAY:  No.  I have provided a full history, including conduct not completing to a conviction, to Mr. Davis.   I'm assuming that that was transferred to Mr. Marquez.

MR. MARQUEZ:  I do have that, Your Honor.

THE COURT:  Is there going to be any argument that criminal behavior by Mr. Johns before or after the incident, even if it doesn't amount to a prior conviction, can be used for impeachment?

MR. MARQUEZ:  No.  That's not the –

THE COURT:  That's not the issue.

MR. MARQUEZ:  That's not the issue.  No, sir.

THE COURT:  What is the issue regarding the pending criminal charges?

MR. MARQUEZ:   Since Mr. Johns is indicating that, by his behavior, that something unusual occurred in his case, here's a person with two strikes who is out on his own recognizance.

THE COURT:  Yes.

MR. MARQUEZ:  Very unusual.  That would indicate to me that there was something.

THE COURT:  You think there was some consideration because of his release and maybe some consideration in terms of how the charges will be dealt with?

MR. MARQUEZ:  Correct.  But we will examine that when the time comes.  I just wanted to make sure we didn't get this –

* * *

MR. MARQUEZ:  But at least that we have this before the Court, I think Counsel would now have an obligation to inquire, whereas before she may have intentionally stayed away from it, been isolated from those cases.

THE COURT:   She'll ask Mr. Johns before he's brought in to testify.

I'm sure you'll inquire as to any promises made to him?

MS. CARAWAY:  Sure.  He's coming this morning, in fact, so we'll see Mr. Johns shortly.

THE COURT:   And if you find anything out, you'll convey it to Mr. Marquez?

MS. CARAWAY:  Yes.  Of course.

19

1    THE COURT:  Shouldn't be any problem.

2    MR. MARQUEZ:  That's all I needed.  Thank you.

3  *Id.* at 57-60.  After this colloquy, the trial court formally ordered that petitioner's previously filed

4  discovery motion was denied.  *Id.* at 56.

### d.  Trial Testimony

### i.  Teresa Spohr's Testimony

At petitioner's trial, Spohr testified that one of the two men who entered the room shot Powell III.  RT at 188.  She said the shooter was not the man who pushed her and told her to leave.  *Id.*  She identified Christopher Johns as the man who was not the shooter.  *Id.* at 189-90.  She was 100% sure of this identification.  *Id.* at 203.

Spohr described the shooter as having a hat, dark hair, and thin, taller than average, and in his mid 20s to early 30s.  *Id.* at 191-92.  She stated she did not focus on his face and did not get a good look at him.  *Id.* at 192-93.  Spohr was later shown a photographic lineup.  *Id.* at 202.  She testified at petitioner's trial that she did not recognize any of the photographs.  *Id.*  However, at the preliminary hearing, Detective Harris of the Chico Police Department testified that Spohr identified two people other than petitioner as the possible shooter.  *Id.* at 27-28.

### ii.  Powell III's Testimony

Powell III described the two men who entered his father's apartment as follows.  One man was taller and muscular.  The other man was shorter and thinner than the first man and was wearing a hat and windbreaker pants.  *Id.* at 219.  He saw the shorter, thinner man shoot his father.  *Id.* at 226.

### iii.  Christopher Johns' Testimony

Christopher Johns also testified.  Petitioner's trial counsel began his cross-examination of Johns by asking him whether, as of September 1, 2007, he was a "two striker."  *Id.* at 314.  The prosecutor objected to that question, arguing that describing Johns' prior convictions as "strikes" was "prejudicial and inappropriate."  *Id.* at 315.  Petitioner's counsel argued that he should be able to ask the question because it bore on a possible bias or lack of credibility on the part of Mr. Johns.  *Id.* at 316.

1    The prosecutor argued that petitioner's counsel could challenge Johns' credibility by

2  simply asking him whether he had suffered three prior felonies, and did not need to categorize

3  those felonies as "strikes." *Id.* at 320.  The following colloquy then occurred:

4           THE COURT:  And I would repeat then to you, Mr. Marquez, that
            what Ms. Caraway is saying has merit, that you could get into this
5           issue of efforts by the officers to pressure Mr. Johns without
            referring to the word "strike," which is a highly-charged prejudicial
6           word.

7           You could question him on the witness stand regarding whether
            Detective Moore mentioned his prior record, mentioned prior
8           felonies as a reason for why he should be cooperating, without
            getting into detail of referring to those prior felonies as strikes.
9
            MR. MARQUEZ:  Well, first of all, your Honor, the record is clear
10          that he has those felonies they constitute strikes, and it's just simply
            part of impeachment.
11

12 *Id.* at 320-21.

13    The trial judge then established that Johns had only been charged with one "strike" prior

14 in his pending criminal case, even though he could have been charged with two "strike" priors.

15 *Id.* at 321-22.  The court stated, "I'm aware of the prosecutorial discretion to charge or not charge

16 strikes without any, any problem from the Court's point of view." *Id.* at 322.  The following

17 colloquy then occurred:

18          MS. CARAWAY:  I guess my problem is that Mr. Marquez spoke
            to Mr. Johns personally two days ago, asked him if he received any
19          consideration for his testimony in this case, Mr. Johns said, "No."

20          Now it seems like Mr. Marquez is trying to bring that out again in
            front of the jury when it has already been responded to as, "No."
21
            THE COURT:  Well, that's consideration for his testimony.  Mr.
22          Marquez's argument is he's already received consideration for his
            prior statements in '07 after the incident.
23
            I don't think there's a big problem here, but it's something out of
24          the blue.  It's something that I need to reflect on for a moment.

25          But again, I'm suggesting to you, Mr. Marquez, that it's enough to
            suggest to Mr. Johns as a witness that he has the prior felonies and
26          that, and that detectives in questioning him mentioned their
            awareness of his prior record and asked him whether or not he felt
27          that as pressure in his mind.

28 /////

It's not a question of whether the detectives were pressuring him. I don't think they were. They were just stating the facts. But whether he interpreted it as pressure would be relevant. And see what his answer is up to that.

Then if he said he felt pressure, you, in going into his credibility, would have to ask him if he colored the statements to the police out of fear arising from this pressure. If he says no, he says no.

MR. MARQUEZ: But I think it's important to do that within the parameters of the special consequences to him of these prior convictions.

THE COURT: I just don't want mention of the word "strike."

MR. MARQUEZ: But the word "strike" is a legal term, it's a –

THE COURT: That's precisely my point, that it's a technical legal term. And that he can, he can go around the issue by saying that he was worried about his record, he was worried about the effect of any additional charges in the then present or future as involving serious consequences. He can indicate how that affected his willingness to cooperate with the officers in September of '07.

Just don't want reference to the word "strike," which has additional emotional meaning and significance, which is more than is necessary for you to make your point.

In other words, that just goes, that goes beyond simply assessing the credibility of Mr. Johns.

It paints him in a special legal category as a possible third striker. It makes him kind of a legal pariah and that goes beyond just questioning his credibility.

Essentially, you're saying you shouldn't believe anything a person like this says because he's a third striker.

MR. MARQUEZ: No. What I am saying, he is especially vulnerable to interrogation because of his precarious condition as a two striker.

THE COURT: As a foundation of that you would have to create a record that he was actually influenced in his own mind by this and felt a feeling of pressure.

If he says, "No," then you're stuck with that answer. I wouldn't allow you to question his denial of that by introducing the fact of being a third striker and leaving it to the jury to conclude that no reasonable person would not feel pressured if they faced that kind of legal consequence.

/////

/////

22

1          To sum it up, basically I'm saying you've got the arguments that
           you need in terms of this lack of credibility based on the prior
2          felony record.  You can go over that.

3  RT at 322-25.

4          The trial judge then stated that petitioner's counsel could ask Johns if he had received any

5  consideration from "law enforcement or the DA . . . in connection with prosecution of the new

6  case."  *Id.* at 325.  When petitioner's counsel asked whether he could ask Johns whether he had

7  been charged with any strikes, the trial judge responded, "That's what we're trying to avoid."  *Id.*

8  The judge explained:

9          THE COURT:  I'm just talking about you're going to ask him if
           he's facing felony criminal charges right now in a case that
10         occurred after the Dye case.  And if he says, "yes," you can ask him
           if he received any consideration from law enforcement or the
11         prosecution in that case as a result of his cooperation in the Dye
           case.
12
           That's the question that we've all agreed that you can ask, but not
13         go into what the charges are or the allegations are in the new case.
           Just that it's a new felony case.
14
           MR. MARQUEZ:  Assuming that he denies that he received any
15         special consideration, then may I not inquire, "Well, isn't it true
           that you could have been charged with two strikes instead of one?"
16
           THE COURT:  No, because if the People gave him consideration
17         that was not bargained for, it doesn't matter.  The People, because
           of his cooperation, could easily decide as a matter of their own
18         discretion not to charge the additional strike.

19         The link up here is did they fail to do so because of some
           negotiation or discussion of the matter with Mr. Johns.
20
           So, what Mr. Johns says about whether that discussion or
21         conversation occurred is the end of the matter.  What the People did
           of their own initiative is irrelevant.
22
           The only way you could raise what the People did as bearing upon
23         Mr. Johns' credibility is if they promised something to him, not that
           they failed to charge something they could have charged without
24         his knowledge.

25         If there's no negotiation over that or discussion of it as a
           conversation for cooperation, it's not something that bears on
26         credibility.

27  /////

28  /////

23

1    MR. MARQUEZ:  Okay.

2    THE COURT:  It has to be a quid pro quo.

3  *Id.* at 327-28.

4    Petitioner's counsel asked whether he could ask specific questions of Mr. Johns as to what

5  he was told by Detective Moore during his interrogation in 2007.  The trial judge responded:

6        THE COURT:  If he testifies that he cooperated because he felt
         threatened or because he felt that promises had been made to him,
7        you can bring that in.  But you can't corroborate it by showing that
         actual consideration was provided, because that's not a logical
8        connection.

9        The way the People framed the case, filed the case, charged Mr.
         Johns, even if it mirrors what Detective Moore was saying, you
10       can't establish that inference unless there's specific discussion of,
         "If you cooperate, we'll do this.  Cooperate, we'll do that."  You
11       can't create circumstantial evidence to attack credibility in this case
         by how the People charge Mr. Johns in the new case.

12

13  *Id.* at 329-30.  At that point, petitioner's counsel requested a "special hearing" with Detective

14  Moore.  The trial court indicated that such a hearing would be proper only "after we hear what

15  Mr. Johns said that Detective Moore said to him to get him to cooperate.  We wouldn't put the

16  cart before the horse and hear from Detective Moore first in anticipation." *Id.* at 331.  The

17  following colloquy then occurred:

18       MS. CARAWAY:  Well, I do agree with the Court that if Mr.
         Marquez asks the witness if he received any consideration or if he
19       felt pressured and if he says no, then it needs to stop there.

20       THE COURT:  That's it.  So I think we have reached a definitive
         answer to these questions.  No mention of the word "strike."
21
         You can go into his prior felony record.  You can go into his state
22       of mind while he was being interviewed regarding any efforts to
         pressure him or to lull him into cooperating. . . .
23
         We'll hear what he has to say.
24

25  *Id.* at 331-32.

26    Mr. Johns testified that he, petitioner, and Christy Scarbrough went to Powell, Jr.'s house

27  to buy drugs.  *Id.* at 302-03.  He testified that he saw petitioner shoot Powell, Jr.  *Id.* at 306-07.

28  He identified petitioner from a color photo lineup.  *Id.* at 313.

24

1   Johns further testified that Detective Moore did not pressure him to make a statement at

2   the 2007 interrogation.  *Id.* at 342.  Johns stated that his police interview was videotaped at his

3   request.  *Id.*  During Johns' trial testimony, the court played a video of his 2007 police interview

4   for the jury.  *Id.* at 337.

5   Johns agreed that he currently had an active criminal case that had been pending since

6   September 1, 2007.  *Id.* at 342-43.  When he was asked whether he had "received any

7   consideration or promise of consideration from the District Attorney's office for [his] testimony

8   in this trial," Johns responded, "none."  *Id.*  Johns also denied feeling any "pressure" to testify at

9   petitioner's trial because of his pending criminal case.  *Id.*

10   Johns denied that when he asked Detective Moore in 2007 whether he knew important

11   people in the DA's office who could "help him out" that he meant he wanted anyone to help him

12   or intervene on his behalf.  *Id.* at 347-48.  He explained that he simply "wanted to know before I

13   said anything that just by going [to Powell, Jr.'s house] to buy dope isn't going to make me an

14   accessory to something crazy."  *Id.* at 348.  Johns agreed that he was told by Detective Moore that

15   the "predicament" he was in was potentially very serious, but he explained Moore said this only

16   because Johns had "asked what was going on."  *Id.* at 349.

17   The trial court sustained the prosecutor's objections to the following questions asked by

18   petitioner's counsel about Johns' pending criminal matter:

19   Q. (by Petitioner's counsel): By the way, before I forget, with
    regards to this pending case that you have, that's been put off until
20   November; is that right?

21   A.  Yes.

22   Q.  And you said it was a felony?

23   A.  Has been set for trial.

24   MS. CARAWAY:  Objection, relevance.

25   THE COURT:  That will be sustained.

26   MR. MARQUEZ:  Is it true that this case that you have pending –

27   THE COURT:   That's stricken.   Already said an answer.   She
    objected, I sustained it.  Anything he said in response is stricken.
28

1          MR. MARQUEZ:  Yes.  Thank you.

2          Q.  (By MR. MARQUEZ)  Is it true that in that case that you have
           pending you have an O.R. release?
3
           A.  Yes.
4
           MR. CARAWAY:  Objection, relevance.
5
           THE COURT:  Sustained.  Answer's stricken.
6

7    RT at 351-52.

8          Petitioner's counsel also questioned Johns about whether he was ever offered any

9    inducement to testify against petitioner:

10         Q.  (by petitioner's trial counsel):  And is it your testimony that you
           never were offered anything?
11
           A.  By who?
12
           Q.  By law enforcement or by the District Attorney's office or by
13         anybody?

14         A.  Offered nothing from none of those.

15         Q.  Did you on your own offer your testimony in return for hoping
           to get some sort of relief later on?
16
           A.  No.  Me and the DA have never spoken about this case and that
17         case together ever.  No law enforcement, no nobody.  It's never
           been brought up in the same conversation.
18
           Q.  But you are represented in the legal matter I referred to earlier,
19         correct?

20         A.  I'm what?

21         Q.  You are represented?  You have counsel?

22         A.  Yeah.

23         Q.   And without going into any details, has your counsel
           communicated to you any kind of agreement?
24
           A.  None whatsoever.
25
           Q.  Have you asked your counsel to communicate to either law
26         enforcement or to the DA your offer to cooperate in return for some
           sort of a reward?
27
           A.  None.  None.
28

1    Q.  Never?

2    A.  (Shakes head.)

3    Q.  And so you're testifying out of the goodness of your heart?

4    THE COURT:  He's probably subpoenaed.

5    THE WITNESS:  Yes.

6    Q.  (By petitioner's counsel):   You're testifying here willingly, correct?

7

8    A.  Yes.

       THE COURT:  Are you under subpoena?

9
       THE WITNESS:  Yes.
10
       THE COURT:  Subpoenas require the testimony.
11

12   *Id.* at 369-70.

13          Mr. Johns also responded to questions about what he meant when he told Detective Moore

14   during his 2007 interrogation that his willingness to cooperate with the investigation "depends:"

15          Q.  Now, you were told early on by Mr. – Detective Moore that he's like to talk to you about what happened.   "Are you interested in conversing about that?"  Do you remember that question?
16

17   * * *

18   A.  Yeah, somewhat.

19   Q.  And do you remember saying, "Depends"?

20   A.  Yes.

21   Q.  Are you thinking depends on what you're giving me in return?

22   A.  No.  It depends on how you're going to go about my safety.

23   Q.  So you're not thinking about working on a deal, you're thinking . . .
24
     A.  No.  I'm thinking about my safety and Christy's safety.
25

26   *Id.* at 417, 419.

27   /////

28   /////

                                        27

#### iv. Testimony of Christy Scarbrough

Christy Scarbrough testified at petitioner's trial that she, petitioner, and Johns went to the home of Powell, Jr. in order to buy methamphetamine. *Id.* at 445-46.  She testified that petitioner and Johns went to Powell, Jr.'s bedroom door and started knocking on it. *Id.* at 446-47.  She heard a loud pop, panicked, and left the apartment with Johns and petitioner. *Id.* at 448.  She stated she "didn't see nothing." *Id.* at 446.  She testified she initially didn't want to tell the police the identity of the person who accompanied her and Johns to Powell, Jr.'s house because she was "scared," but eventually she "came out with the truth;" i.e., that petitioner was that person. *Id.* at 450, 454.  She also identified petitioner from a photo lineup. *Id.* at 454, 313.

#### v. Testimony of Lena Forbes

Lena Forbes testified that after the methamphetamine she had purchased from Powell ran out at the party in Chico, petitioner asked to borrow her car. *Id.* at 156-57.  She watched petitioner, Johns, and Scarbrough drive off in her car, with petitioner driving. *Id.* at 157.  All three of them returned to the hotel approximately two hours later. *Id.* at 158, 166.  Petitioner returned the car key to her. *Id.* at 166.

### e.  Petitioner's Motion for Stay and Abeyance

On April 6, 2015, petitioner filed a motion to stay this action so that he could "exhaust evidence in support of facts" underlying his *Brady* and *Napue* claims (claims 1(b), (c), and (d)).  ECF No. 82 at 1.  That motion was heard in the courtroom of the undersigned on May 13, 2015.

By his motion for stay, petitioner wishes to present two declarations to the state courts in order to support the allegation in paragraph 34 of the Second Amended Petition that the "confidential report" was not disclosed by the prosecutor to defense counsel prior to trial, in violation of *Brady v. Maryland*. *Id.* at 7; *see also* ECF No. 56 at 25.  Petitioner explains that "the only reason [he] has been forced to make this motion" is to rebut respondent's assertion in the answer that the confidential memorandum was provided to petitioner's trial counsel in discovery.  ECF No. 82 at 8.  Petitioner argues that "in order to make clear the critical allegation that the [confidential] report was never given to trial counsel by the prosecution, petitioner is requesting

*/////*

28

1    that this Court stay and abey this petition to allow counsel to exhaust evidence in support of facts

2    stated in the Second Amended Petition." *Id.* at 4.

3         The first declaration petitioner wishes to present to the state courts is that of Grady Davis,

4    petitioner's initial trial counsel, who withdrew from representing petitioner after he concluded

5    that he had a potential conflict of interest.  Mr. Davis declares that on May 19, 2009, when he

6    walked into the courtroom to litigate the discovery motion he had filed on petitioner's behalf, the

7    prosecutor told him he had a conflict of interest in representing petitioner because of allegations

8    made against him by Christopher Johns.  ECF No. 72-21 at 1.  The prosecutor then showed Davis

9    a police report that he had never seen before (the "confidential report"), and directed his attention

10   to one portion of the report wherein Mr. Johns accused Mr. Davis of trying to dissuade Johns

11   from testifying against petitioner and/or to testify falsely.  *Id.* at 1-2.  Mr. Davis declares that he

12   "read it quickly," realized that Mr. Johns' statements created a conflict of interest, handed the

13   report back to the prosecutor, told the presiding judge that he had a conflict, and asked permission

14   to withdraw from representation of petitioner.  *Id.* at 2.  The trial judge then granted Davis'

15   request to withdraw.  *Id.*

16        The second declaration is that of Arturo Marquez, the attorney who replaced Mr. Davis as

17   petitioner's counsel.  Mr. Marquez declares that prior to and during petitioner's trial, he made

18   multiple requests for discovery, "particularly with regard to Christopher Johns, the principal

19   witness against Mr. Dye."  ECF No. 72-22 at 1.  Marquez states that on September 4, 2014,

20   petitioner's current habeas counsel faxed him a copy of the "confidential report."  He further

21   declares that after reading the memorandum, he "can categorically state" that he had never seen it

22   before that time and had not been provided with it in discovery.  *Id.* at 1-2.

23        Petitioner also directs the court's attention to a third declaration – that of petitioner's

24   friend Jackie Herseth.  Ms. Herseth declares, in pertinent part, that after petitioner received his

25   case file from Mr. Marquez, he noticed that the confidential report was not in the file.  ECF No.

26   72-16.  At petitioner's request, Ms. Herseth contacted Mr. Marquez and "told him a report was

27   missing from the defense case file" that had been "used to get Mr. Davis off the case."  *Id.* Mr.

28   Marquez stated he didn't have the report but that he would get it from the D.A.'s office.  *Id.*

1   Marquez eventually obtained the report and faxed it to Ms. Herseth.  *Id.*  Petitioner argues that "it

2   is fairly inferable that Mr. Marquez never got the report in discovery [based on] Ms. Herseth's

3   declaration that the 'confidential' report was not in the trial file."  ECF No. 82 at 4.[3]

4       Based on the declarations of Mr. Marquez and Mr. Davis, this court will assume for

5   purposes of this habeas proceeding that neither of petitioner's trial counsel received a copy of,

6   saw, or read the confidential report during discovery or at any other time prior to petitioner's trial.

7   However, for the reasons explained below, even assuming that neither of petitioner's trial counsel

8   were aware of the confidential report petitioner's habeas claims fail.  Accordingly, it is

9   recommended that petitioner's motion for stay and abeyance, which has been filed in order to

10  establish that his trial counsel did not have, and had not seen, the confidential police report prior

11  to or during petitioner's trial, be denied as unnecessary.[4]  It is also recommended that petitioner's

12  related motion for the issuance of a subpoena duces tecum to obtain a compact disc of the March

13  4, 2009 meeting described in the confidential report be denied.  *See Cullen v. Pinholster*, 563 U.S.

14  ___, 131 S. Ct. 1388, 1398 (2011) (holding that federal review of habeas corpus claims under

15  § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on

16  the merits.").

17              **2.  Petitioner's Arguments**

18                  **a.  Overview**

19      As petitioner acknowledges, his claims of ineffective assistance of counsel and

20  prosecutorial misconduct are all concerned with the credibility of Johns' testimony at petitioner's

21  trial.  ECF No. 56 at 11 ("whether the genesis of a particular subpart is the ineffective assistance

22  of counsel, prosecutorial misconduct, or a ruling of the trial court infringing on the right to cross-

23  examination, all concern errors relating to impeachment of the credibility of Mr. Johns'

24  testimony").  Petitioner notes that when Johns was interviewed by Detective Moore after the

25          [3]   It does not appear that petitioner is seeking to submit the Herseth declaration to the
26  state courts.

27          [4]    To the extent petitioner is requesting a stay of these proceedings in order to present
    other, unspecified facts to the state courts, his request will be denied for lack of good cause and a
28  proper showing of support, and due to a lack of specificity for any such request.

30

1   shooting and was asked whether he was willing to cooperate with the investigation, he responded,

2   "depends."  *See* ECF No. 56-5 at 4.  Petitioner argues that this response by Johns "made it

3   unmistakably clear that he (Johns) wanted to be amply rewarded for any cooperation he might

4   tender by telling the police his version of what happened that night."  ECF No. 56 at 17.

5   Petitioner also notes that Detective Moore reminded Johns he already had two strikes and did not

6   want to get a third strike, and told Johns he would "work with you as much as I can."  *Id.* at 17-

7   18; *see* ECF No. 56-5 at 9.  Petitioner argues that, "taking the bait with both hands, Mr. Johns

8   identified petitioner as the shooter."  ECF No. 56 at 18.

9           Petitioner further argues that because of Johns' trial testimony against petitioner, Johns

10   was not charged with any crime in this case, even though "he had liability for the shooting, both

11   as an aider and abettor and as accessory after the fact."  *Id.* at 18-19.  Petitioner also notes that

12   Johns had a pending criminal matter at the time he testified at petitioner's trial.  He argues that,

13   because of his testimony against petitioner, Johns received favorable treatment in that criminal

14   matter.  Specifically, as set forth above: (1) Johns was arrested in 2009 for possession and sale of

15   a controlled substance, but he was not charged with the maximum number of strikes he could

16   have been charged with; (2) after he met with Detective Moore and prosecutor Calaway in March,

17   2009, Johns' parole hold was lifted, his $130,000 bail was vacated, and he was released on his

18   own recognizance; and (3) after petitioner's trial was over, Johns pleaded guilty to simple

19   possession of a dangerous drug with no priors.  *Id.* at 23-26.  Johns was then sentenced to straight

20   probation with no time in prison.  *Id.* at 20, 26; *see also* ECF No. 56-7.  Petitioner asserts that the

21   foregoing favorable treatment in his pending criminal case constitutes "undisclosed

22   consideration" for Mr. Johns' trial testimony.

23           Petitioner also notes that during Johns' sentencing proceedings in his pending criminal

24   matter, his counsel informed the court that he and the prosecutor had "worked closely on a

25   negotiated disposition and a resolution of this case" and the prosecutor explained that Johns' was

26   an "unusual case" for reasons "involving a jury trial."  ECF No. 56 at 26, 36.  Petitioner argues

27   that these comments by counsel at Johns' sentencing hearing prove that Johns' sentence was "a

28   bargained disposition resulting from Mr. Johns' cooperation in petitioner's trial."  *Id.* at 26.  In

1    addition, as set forth above, Johns was subsequently arrested again for a probation violation and

2    when his counsel asked for leniency based on Johns' testimony in petitioner's case, the prosecutor

3    commented "it's best not to try to sell the same car twice." *Id.* at 27; ECF No. 56-12 at 3.

4    Petitioner argues this comment suggests petitioner had already received leniency based on his

5    testimony at petitioner's trial in his previous case. *Id.*

6         Petitioner also argues that Mr. Johns testified falsely when he: (1) denied that he was

7    pressured or induced by promises of leniency from Detective Moore to testify against petitioner;

8    (2) stated that he was testifying voluntarily and "out of the goodness of his heart;" (3) testified

9    that he wasn't concerned about the consequences of his prior "strike" convictions; and (4) denied

10   that he wanted to know whether cooperating in the case against petitioner might help him.  ECF

11   No. 56 at 20-21.

12                        **b.  Ineffective Assistance of Trial Counsel**

13        Petitioner claims that his trial counsel rendered ineffective assistance for several reasons.

14   First, petitioner faults trial counsel for failing to "challenge Mr. Johns' denial that there was a

15   cooperation agreement by confronting him with Det. Moore's promise to get him the 'best

16   possible sentence' if he cooperated." *Id.* at 28.  Petitioner concedes that his trial counsel's efforts

17   to challenge Johns' testimony on this subject were made more difficult by the trial court's

18   evidentiary rulings, set forth at length above, by which counsel was precluded from asking Johns

19   about his prior "strikes." *Id.*  However, petitioner argues his trial counsel could have used the

20   transcript of Johns' 2007 interrogation to establish evidence of a specific agreement by the

21   prosecution to benefit Johns if he testified against petitioner. *Id.* at 28-29.  Petitioner argues, "it's

22   hard to imagine a clearer statement of a *quid pro quo* cooperation agreement than Det. Moore's

23   admonition that if Mr. Johns cooperated, Det. Moore would make sure he was rewarded with 'the

24   best possible sentence.'" *Id.*

25        Petitioner acknowledges that the videotape of Johns' interrogation was played for the jury,

26   which included Detective Moore's promise to get Johns "the best possible sentence." *Id.*.

27   However, he contends there is no way to know whether the jury actually heard that portion of the

28   interview because at some unidentified point in the playback of the tape, it was fast-forwarded.

1    *Id.*; *see* RT at 412.  Petitioner argues, "even if the jurors had heard that portion of the tape where

2    Det. Moore made his promise, it would still have been ineffective assistance of counsel for trial

3    counsel to abstain from confronting Mr. Johns with Det. Moore's promise and at least attempting

4    to obtain his admission of the untruthfulness of his prior testimony on that subject."  ECF No. 56

5    at 30.  Petitioner also argues that his trial counsel should have argued there was an explicit

6    cooperation agreement between the government and Johns, evidenced by Detective Moore's

7    statement to Johns during his police interrogation that "if you tell me everything, I will do my

8    best to get you the best possible sentence," and that trial counsel should have confronted Johns

9    with the fact that this statement was made to him by Detective Moore.  *Id.* at 22-23.

10          Petitioner also argues that his trial counsel rendered ineffective assistance in failing to

11   cross-examine Johns after he testified that when he replied "depends" to Detective Moore's query

12   about whether he was willing to cooperate with the police investigation, he was referring to

13   concerns about his safety and not to his desire to obtain a benefit from testifying against

14   petitioner.  *Id.* at 31.  Petitioner contends his trial counsel should have confronted Johns with the

15   transcript of his 2007 interrogation, during which Detective Moore mostly discussed "cooperation

16   and rewards for cooperation" and not Johns' safety.  *Id.*  Petitioner argues, "a reasonably

17   competent attorney in those circumstances would have certainly used the transcript to impeach

18   Mr. Johns' testimony and to show that his willingness to cooperate with Det. Moore 'depended'

19   upon the consideration he would receive, not the security arrangements."  *Id.* at 31-32.  Petitioner

20   also argues that trial counsel did not "confront" Johns with the statements made by Moore during

21   the interrogation that "centered on assurances that good things will come from cooperation."  *Id.*

22   at 23.

23          Finally, petitioner claims his trial counsel rendered ineffective assistance in failing to call

24   Grady Davis and Detective Moore as trial witnesses.  *Id.* at 59, 60.  He argues Mr. Davis could

25   have testified that he did not try to suborn perjury, contrary to the allegations made by Mr. Johns.

26   He claims that Davis' testimony "refuting this allegation would have been relevant and

27   admissible testimony that would have impugned the credibility of Mr. Johns.  *Id.* at 59.  With

28   respect to Detective Moore, petitioner argues Moore could have provided evidence that "promises

1  of consideration were made to Mr. Johns in return for his cooperation and testimony against

2  petitioner." *Id.* at 60. Petitioner contends that Moore "would have had to acknowledge the

3  various assurances and promises he made to Mr. Johns in the initial interview;" specifically,

4  telling Johns if he cooperated he would "work with you as much as I can;" telling Johns that he

5  would be making important recommendations regarding Johns' involvement in the shooting

6  based on Johns' "level of cooperation;" and telling Johns, "If you tell me everything, I will do my

7  best to get you the best possible sentence." *Id.* Petitioner concedes the trial court was "hostile" to

8  any questions in this area, but he argues that "the prejudice of failing to call Det. Moore . . . is

9  manifest on its face." *Id.*

10                **c.  Ineffective Assistance of Appellate Counsel**

11         Petitioner claims that his appellate counsel rendered ineffective assistance in failing to

12  challenge on direct appeal the trial court's erroneous evidentiary rulings that precluded trial

13  counsel from asking Johns about his prior "strikes," and/or whether he had been offered any

14  consideration for his testimony against petitioner. Petitioner argues these rulings unduly

15  restricted trial counsel's cross-examination of Johns, in violation of his rights under the

16  Confrontation Clause and his right to present his defense that Johns was "under severe pressure to

17  cooperate when he was interrogated, namely that his prior made the felony he was arrested for

18  carry a life sentence." *Id.* at 44, 47. *see also* RT at 323-30. Petitioner argues that his right to

19  cross-examine Johns on this subject was "an integral part of the right to cross examine." ECF No.

20  56 at 47, 48.

21                **d.  Prosecutorial Misconduct**

22         Petitioner claims that the prosecution violated its obligations under *Brady v. Maryland* in

23  several respects, all of them involving the testimony of Christopher Johns. Petitioner first

24  contends that the prosecutor failed "to disclose that it had, in fact, made a cooperation agreement

25  with Mr. Johns in return for his testimony." *Id.* at 33. He argues that Johns' lenient treatment in

26  his criminal case that was pending at the time of petitioner's trial, described above, constitutes

27  "overwhelming" evidence that Johns received consideration for his testimony against petitioner.

28  *Id.* Petitioner points out that after Detective Moore told Johns he would try to get his parole hold

                                          34

1    lifted, the court reduced Johns' bail of $130,000 and released him on his own recognizance, and

2    allowed Johns to plead no contest to one count of simple possession of dangerous drugs.

3    Petitioner argues that Johns' sentence was apparently the result of a plea bargain even though plea

4    bargaining is prohibited by California law in all cases where a serious felony is charged. *Id.* at

5    34-36. Petitioner argues these facts provide evidence that Johns was offered leniency on his

6    pending criminal case in exchange for his testimony against petitioner, contrary to his trial

7    testimony that he was not extended any such offers. *Id.* at 36. Petitioner argues the prosecutor's

8    concealment of and failure to disclose this agreement with Johns violated the holding of *Giglio v.*

9    *United States*. *Id.* at 36-37.

10         In a related argument, petitioner argues the prosecutor violated her constitutional

11    obligations in soliciting false testimony from Johns that he did not receive any promise of

12    consideration in return for his testimony against petitioner. *Id.* at 38. Petitioner contends the

13    prosecutor "lied" to the court and to defense counsel when she stated she was unaware of any

14    cooperation agreement with Johns. *Id.* He notes the prosecutor informed the trial judge that she

15    had been "intentionally kept away" from Johns' pending criminal case. He argues that "the only

16    conceivable reason" this would have been done "would be to give Ms. Caraway deniability, to

17    allow her to tell the court with a straight face that she knew nothing about any cooperation

18    agreement." *Id.* at 39. Petitioner points out that, in any event, the prosecutor had a duty to "find

19    out about any promises made to Mr. Johns." *Id.* Petitioner argues, "simply put, Ms. Caraway

20    suborned perjury when she elicited Mr. Johns' denial of having received any consideration." *Id.*

21    at 40.

22         Petitioner also argues that the prosecutor committed misconduct in failing to tell the trial

23    court or the trial judge that she had been present at the March 4, 2009 meeting with Detective

24    Moore and Mr. Johns, and in failing to turn over the "confidential report" to the defense in

25    discovery. *Id.* He argues this report is evidence of a "cooperation agreement." *Id.* at 42.

26    /////

27    /////

28    /////

35

### 3. Applicable Law

#### a. Legal Principles: Ineffective Assistance of Counsel

The applicable legal standards for a claim of ineffective assistance of counsel are set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687.  Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88 (quoting *Strickland*, 466 U.S. at 687).

A reviewing court is required to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669; *see Richter*, 131 S.Ct. at 789.  Reviewing courts must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  This presumption of reasonableness means that the court must "give the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1407 (2011) (internal quotation marks and alterations omitted).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S.Ct. at 792.  A reviewing court "need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

1    The *Strickland* standards apply to appellate counsel as well as trial counsel. *Smith v.*

2    *Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).

3    However, an indigent defendant "does not have a constitutional right to compel appointed counsel

4    to press nonfrivolous points requested by the client, if counsel, as a matter of professional

5    judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

6    Counsel "must be allowed to decide what issues are to be pressed." *Id.* Otherwise, the ability of

7    counsel to present the client's case in accord with counsel's professional evaluation would be

8    "seriously undermined." *Id. See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998)

9    (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and is not even

10   particularly good appellate advocacy.")  There is, of course, no obligation to raise meritless

11   arguments on a client's behalf. *See Strickland*, 466 U.S. at 687-88 (requiring a showing of

12   deficient performance as well as prejudice).  Thus, counsel is not deficient for failing to raise a

13   weak issue. *See Miller*, 882 F.2d at 1434.  In order to establish prejudice in this context,

14   petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on

15   appeal. *Id.* at 1434 n.9.

16                              **b. Legal Principles: Prosecutorial Misconduct**

17   On habeas review of a prosecutorial misconduct claim, the court may grant relief only if

18   the misconduct rises to the level of a due process violation. *See Sechrest v. Ignacio*, 549 F.3d

19   789, 807 (9th Cir. 2008).  A violation of a defendant's rights occurs if the government knowingly

20   uses false evidence in obtaining a conviction. *Giglio v. United States*, 405 U.S. 150, 153-54

21   (1971); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  It is clearly established that "a conviction

22   obtained by the knowing use of perjured testimony must be set aside if there is any reasonable

23   likelihood that the false testimony could have affected the jury's verdict." *United States v.*

24   *Bagley*, 473 U.S. 667, 680 n.9 (1985). *See also Morales v. Woodford*, 388 F.3d 1159, 1179 (9th

25   Cir. 2004) ("The due process requirement voids a conviction where the false evidence is 'known

26   to be such by representatives of the State.'") (quoting *Napue*, 360 U.S. at 269).  Due process is

27   violated in such circumstances regardless of whether the false testimony was obtained through the

28   active conduct of the prosecutor, *Hysler v. Florida*, 315 U.S. 411 (1942); *Mooney v. Holohan*,

37

1  294 U.S. 1033 (1935), or was unsolicited.  *Napue*, 360 U.S. at 269 ("[t]he same result obtains

2  when the State, although not soliciting false evidence, allows it to go uncorrected when it

3  appears").  This rule applies even where the false testimony goes only to the credibility of the

4  witness.  *Napue*, 360 U.S. at 269; *Mancuso v Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

5           There are several components to establishing a claim for relief based on the prosecutor's

6  introduction of perjured testimony at trial.  First, the petitioner must establish that the testimony

7  was false.  *United States v. Polizzi*, 801 F.2d 1543, 1549-50 (9th Cir. 1986).  Second, the

8  petitioner must demonstrate that the prosecution knowingly used the perjured testimony.  *Id.*

9  Finally, the petitioner must show that the false testimony was material.  *United States v. Juno-*

10  *Arce*, 339 F.3d 886, 889 (9th Cir. 2003).  False evidence is material "if there is any reasonable

11  likelihood that the false [evidence] could have affected the judgment of the jury."  *Hein v.*

12  *Sullivan*, 601 F.3d 897, 908 (9th Cir. 2010) (quoting *Bagley*, 473 U.S. at 678).  Mere speculation

13  regarding these factors is insufficient to meet petitioner's burden.  *United States v. Aichele*, 941

14  F.2d 761, 766 (9th Cir. 1991).

15           In *Brady v. Maryland*, the United States Supreme Court held "that the suppression by the

16  prosecution of evidence favorable to an accused upon request violates due process where the

17  evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

18  the prosecution."  373 U.S. at 87.  *See also Bailey v. Rae*, 339 F.3d 1107, 1113 (9th Cir. 2003).

19  The duty to disclose such evidence is applicable even though there has been no request by the

20  accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and encompasses impeachment

21  evidence as well as exculpatory evidence.  *Bagley*, 473 U.S. at 676.  A *Brady* violation may also

22  occur when the government fails to turn over evidence that is "known only to police investigators

23  and not to the prosecutor."  *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (quoting

24  *Kyles v. Whitley*, 514 U.S. 419, 437, 438 (1995)) ("[T]he individual prosecutor has a duty to learn

25  of any favorable evidence known to the others acting on the government's behalf in the case,

26  including the police").

27           There are three components of a *Brady* violation: "[t]he evidence at issue must be

28  favorable to the accused, either because it is exculpatory, or because it is impeaching; the

1   evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

2   must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  *See also Banks v. Dretke*,

3   540 U.S. 668, 691 (2004); *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005).  "The prosecutor,

4   although 'not required to deliver his entire file to defense counsel,' is required to turn over

5   evidence that is both favorable to the defendant and material to the case." *Amado v. Gonzalez*,

6   758 F.3d 1119, 1134 (9th Cir. 2014) (quoting *Bagley*, 473 U.S. at 675).

7        A defendant is prejudiced by a *Brady* violation if the evidence that was not produced is

8   material.  *Id.*  Evidence is material if "'there is a reasonable probability' that the result of the trial

9   would have been different if the suppressed documents had been disclosed to the defense."

10  *Strickler*, 527 U.S. at 289.  "The question is not whether petitioner would more likely than not

11  have received a different verdict with the evidence, but whether "in its absence he received a fair

12  trial, understood as a trial resulting in a verdict worthy of confidence." (*Id.*) (quoting *Kyles*, 514

13  U.S. at 434s.  *See also Shelton v. Marshall*, ___ F.3d ___, 2015 WL 4664530 at *7 (9th Cir. Aug.

14  7, 2015); *Silva*, 416 F.3d at 986 ("a *Brady* violation is established where there 'the favorable

15  evidence could reasonably be taken to put the whole case in such a different light as to undermine

16  confidence in the verdict.'")  Once the materiality of the suppressed evidence is established, no

17  further harmless error analysis is required.  *Kyles*, 514 U.S. at 435-36; *Silva*, 416 F.3d at 986.

18  "When the government has suppressed material evidence favorable to the defendant, the

19  conviction must be set aside." *Silva*, 416 F.3d at 986.

20              **4.  Analysis**
                   **a.  Whether the Prosecution Entered into a Cooperation**
21                 **Agreement with Christopher Johns**

22

23          As set forth above, petitioner claims that Christopher Johns was promised consideration

24  from the prosecution for his testimony in this case but that this fact was never disclosed to the

25  defense or acknowledged during Johns' trial testimony.  As evidence of this alleged promise of

26  consideration, petitioner offers the following: (1) at the beginning of his 2007 police interview,

27  Johns responded "depends" when asked whether he was willing to cooperate; (2) during his 2007

28  police interrogation, Detective Moore told Johns that, while there were no guarantees, if Johns

told Moore "everything," he (Moore) would do his best to get Johns "the best possible sentence; (3) Johns was not charged with a crime in connection with this case; (4) Johns was subsequently arrested for another crime but was not charged with the maximum number of strikes he was eligible for; (5) during a conversation on March 4, 2009, Johns told petitioner he would try to get his parole hold lifted on his pending criminal case; and (6) subsequently, Johns' parole hold was lifted, he was released on his own recognizance, and he was eventually charged with a lesser crime and sentenced to straight probation.  Petitioner argues that evidence of a cooperation agreement between the prosecution and Johns was further confirmed during the sentencing proceedings in Johns' subsequent criminal matters when Johns' attorney and the prosecutor in those cases referred to Johns having previously received benefits for his cooperation in connection with "a jury trial."  Petitioner claims his trial counsel rendered ineffective assistance in failing to prove the existence of such a cooperation agreement and that the prosecutor committed misconduct in failing to disclose the agreement with Johns.

It is well established that "[e]vidence of a deal or promise of lenient treatment in exchange for a witness's testimony against a defendant may constitute evidence that must be disclosed under *Brady* and *Napue*."  *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006) (citing *Giglio v. United States*, 405 U.S. 150, 154–55 (1972).  "The deal or promise need not be express; failure to disclose an agreement or guarantee of leniency 'indicated without making a bald promise' also may violate *Brady*."  *Hovey*, 458 F.3d at 917 (quoting *United States v. Butler*, 567 F.2d 885, 888 n.4 (9th Cir.1978) (per curiam)).  Thus, the Ninth Circuit has found a *Brady* violation where the evidence "implie[d] that a tacit agreement was reached between [a witness] and the government . . . in exchange for his cooperation."  *United States v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986).  *See also Sivak v. Hardison*  658 F.3d 898, 910 (9th Cir. 2011) (court found a *Brady* violation based on undisclosed letters reflecting a tacit agreement for leniency).  However, "in the absence of a promise or deal, a witness's subjective belief that he might receive lenient treatment in exchange for testifying does not render perjurious his testimony that he received no promises that he would benefit from testifying."  *Hovey*, 458 F.3d at 917.

/////

1    Here, there is no direct evidence of a cooperation agreement between the prosecutor and

2 Christopher Johns.  Johns denied on the witness stand that he was promised any benefit in

3 exchange for his testimony against petitioner, and petitioner has provided no written evidence of

4 any such agreement.  Petitioner has, however, provided evidence that Johns received what

5 appears to have been lenient treatment in connection with a criminal action pending at the time of

6 his testimony at petitioner's trial.  Petitioner has also directed the court's attention to somewhat

7 cryptic comments by Johns' trial counsel in a subsequent criminal proceeding that allude to

8 Johns' case being "unusual" for reasons involving "a jury trial."  Petitioner also notes that Johns

9 was not charged with a crime in connection with the instant case.  Petitioner argues that all of

10 these circumstances constitute evidence that the prosecution offered benefits to Johns in exchange

11 for his agreement to testify at petitioner's trial.

12    In the absence of more than circumstantial evidence suggesting the possibility of some

13 sort of cooperation agreement with Johns, the exact parameters of which are undefined, this court

14 cannot conclude with reasonable certainty that such an agreement was entered into.  Neither the

15 record of Johns' 2007 police interrogation, nor the "confidential report," disclose the outlines of

16 any deal between Johns and the prosecutors in this case.  With respect to Johns' 2007 police

17 interrogation, nothing Detective Moore said to petitioner constitutes a promise of specific benefits

18 for testifying; Moore specifically told Johns there were "no guarantees."  The court rejects

19 petitioner's argument that Moore's statement, "if you tell me everything, I will do my best to get

20 you the best possible sentence" is an "explicit agreement" to provide a specific benefit for trial

21 testimony.  *See* ECF No. 56 at 22.  And while the confidential report states that Detective Moore

22 "talked to Johns about his current criminal case," the report does not contain any evidence of a

23 cooperation agreement.

24    As the trial judge noted, it is possible the District Attorney's Office decided to reward

25 Johns for his testimony without giving him any specific promises before he testified.  It is also

26 possible Johns was released from custody in his 2009 criminal matter because prosecutors were

27 concerned with his safety, a concern Johns expressed at every possible opportunity.  Further, as

28 noted by respondent, Johns told Detective Moore during his initial interrogation in 2007 that

1  petitioner was the shooter, before any cooperation agreement could have been offered and well

2  before the 2009 meeting memorialized by the "confidential report."  This fact dilutes petitioner's

3  argument that Johns only agreed to testify against petitioner in exchange for a promise of

4  benefits.  *See United States v. Rodriguez*, 766 F.3d 970, 988 (9th Cir. 2014) (insufficient evidence

5  of a cooperation agreement that the government would seek a sentence reduction in exchange for

6  the witness's favorable testimony, even though the government sought to reduce witness's

7  sentence on the same day the verdicts were rendered, because petitioner "failed to demonstrate

8  that any of the government's post-verdict actions were . . . premised on an undisclosed tacit

9  agreement").  *Cf. Shelton*, 2015 WL 4664530 at *5 (finding of *Brady* violation where specific

10  evidence of secret agreement between prosecutor and counsel for prosecution witness was not

11  disclosed to defense).

12         Even assuming arguendo that Johns was promised leniency in exchange for his trial

13  testimony against petitioner, he has failed to demonstrate that disclosure of this information

14  would have changed the outcome of his trial.  As noted above, Johns identified petitioner as the

15  shooter almost immediately after the crime occurred, before any cooperation agreement was

16  possible.  Scarbrough testified that she went with Johns and petitioner to Powell's house.  Forbes

17  testified she watched petitioner, Johns and Scarbrough leave together to go to Powell's house and

18  then saw them come back again about 90 minutes later.  The evidence reflected that only

19  petitioner and Johns approached Powell's bedroom door prior to the shooting.  Spohr testified that

20  two men entered Powell's bedroom prior to the shooting: Johns, who did not shoot Powell, and

21  another man, who did shoot Powell.  Petitioner himself did not identify Johns as the shooter – his

22  defense was that a relative of Johns was responsible.  This left only petitioner as the person who

23  shot Powell.  In light of all of this testimony, the evidence was overwhelming that petitioner shot

24  Powell.  In light of this, there is no reasonable probability the result of the trial would have been

25  different if the jury had learned that Johns was promised some form of leniency in exchange for

26  his agreement to testify at petitioner's trial.

27  /////

28  /////

42

**b. Ineffective Assistance of Trial Counsel**

Petitioner has failed to demonstrate that his trial counsel rendered deficient performance in his cross-examination of Johns.  The record reflects that trial counsel thoroughly and competently questioned Johns about the existence of a promise of leniency in exchange for his trial testimony.  Counsel repeatedly raised this issue in the trial court and impeached Johns' testimony as well as could be expected, given the trial court's evidentiary rulings restricting his questions on the subject.

Petitioner has also failed to demonstrate prejudice with respect to this claim.  There is no evidence Johns would have admitted the existence of a promise of leniency in exchange for his testimony.  Johns repeatedly denied the existence of any such agreement.  It does not appear that questioning Johns about his 2007 police interrogation would have led to such an admission either, given the absence of any specific promises from Detective Moore in that transcript.  In any event, the videotape of Johns' 2007 interrogation was played for the jurors, allowing them to hear for themselves whether Detective Moore made any promises to Johns.  Petitioner has failed to show that the outcome of the proceedings would have been different had his trial counsel more effectively cross-examined Christopher Johns.

Petitioner's claims that his trial counsel rendered ineffective assistance in failing to call Grady Davis and Detective Moore as trial witnesses should also be rejected due to petitioner's failure to make any showing of prejudice.  Without evidence as to what additional witnesses would have testified to at trial, a habeas petitioner cannot establish prejudice with respect to a claim of ineffective assistance of counsel for failing to call trial witnesses.  *See Dows v. Wood*, 211 F.3d 480, 486-87 (2000) (no ineffective assistance of counsel for failure to call an alleged alibi witnesses where petitioner did not identify an actual witness, did not provide evidence that the witness would have testified, nor presented an affidavit from the alleged witness he claimed should have been called); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (same); *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence in the record that the witness would testify); *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987)

1   (appellant failed to satisfy the prejudice prong of an ineffectiveness claim because he offered no

2   indication of what potential witnesses would have testified to or how their testimony might have

3   changed the outcome of the hearing).  Petitioner has failed to demonstrate that attorney Davis

4   and/or Detective Moore would have agreed to testify or that their testimony would have changed

5   the outcome of his trial.  In particular, there is no evidence before the court that Detective Moore

6   would have testified he promised Johns leniency in exchange for Johns' trial testimony.

7       Because petitioner has filed to demonstrate deficient performance or prejudice, he is not

8   entitled to habeas relief on his claims of ineffective assistance of trial counsel.

9                           **c. Prosecutorial Misconduct**

10      For similar reasons, petitioner has also failed to demonstrate that the prosecutor

11  committed misconduct in failing to disclose that it had entered into a cooperation agreement with

12  Mr. Johns in exchange for his testimony, in soliciting perjurious testimony from Johns about such

13  an agreement, or in failing to turn over evidence of an agreement to the defense.  As discussed

14  above, petitioner has failed to show the existence of such an agreement or that it was material in

15  light of the overwhelming evidence of petitioner's guilt.  Under the circumstances of this case,

16  there is no reasonable probability that the result of the trial would have been different if the

17  existence of a cooperation agreement had been disclosed to the defense.  Put another way, the

18  government's failure to disclose an agreement does not undermine confidence in the verdict in

19  this case.

20      It appears the prosecutor may have committed misconduct in allowing Johns to testify that

21  he never discussed his pending 2009 criminal case with law enforcement.  The "confidential

22  report" appears to directly contradict that statement when it reflects that Detective Moore "talked

23  to Johns about his current criminal case" during the March 4, 2009 meeting at which the

24  prosecutor was present.  However, as discussed above, under the circumstances of this case there

25  is no reasonable probability that disclosure of this fact would have changed the outcome of the

26  proceedings.

27      The decision of the California Supreme Court rejecting petitioner's claim of prosecutorial

28  misconduct is not contrary to or an unreasonable application of United States Supreme Court

1    authority.  In particular, it is not "so lacking in justification that there was an error well

2    understood and comprehended in existing law beyond any possibility for fairminded

3    disagreement."  *Richter*, 562 U.S. at 103.  Accordingly, petitioner is not entitled to relief on this

4    claim.

5                         **d.  Ineffective Assistance of Appellate Counsel**

6            As set forth at length above, the trial court precluded petitioner's counsel from asking

7    Johns whether he had suffered any prior "strike" convictions.  The trial court also denied

8    counsel's request to question Johns about his pending criminal matter, including whether he could

9    have been "charged with two strikes instead of one," if Johns denied he had received any special

10   consideration for his testimony against petitioner.  Petitioner claims his appellate counsel

11   rendered ineffective assistance in failing to challenge these rulings by the trial court.

12           Petitioner has failed to meet *Strickland*'s deficient performance component with respect to

13   these claims.  Counsel need not raise every non-frivolous issue on appeal.  *Smith v. Robbins*, 528

14   U.S. 259, 288 (2000) ("'only when ignored issues are clearly stronger than those presented, will

15   the presumption of effective assistance of counsel be overcome.'") (quoting *Gray v. Greer*, 800

16   F.2d 644, 646 (7th Cir. 1986)); *Jones v. Barnes*, 463 U.S. 745 (1983) (an experienced attorney

17   knows the importance of "winnowing out weaker arguments on appeal and focusing on one

18   central issue if possible, or at most on a few key issues"); *Smith v. Murray*, 477 U.S. 527, 536

19   (1986) ("Th[e] process of winnowing out weaker arguments on appeal and focusing on those

20   more likely to prevail, far from being evidence of incompetence, is the hallmark of effective

21   appellate advocacy.").  An appellate advocate provides effective assistance by "winnowing out" a

22   weaker claim and focusing on a stronger claim.  *See Strickland v. Washington*, 466 U.S. 668, 689

23   (1984) ("Judicial scrutiny of counsel's performance must be highly deferential.").

24           Even if appellate counsel was deficient in failing to raise all non-frivolous claims,

25   petitioner has failed to demonstrate prejudice.  Petitioner has failed to show that he probably

26   would have prevailed on appeal if he had raised a claim that the trial court's evidentiary rulings

27   violated state evidentiary law or his right to confront the witnesses against him.  The decision of

28   the California Supreme court denying this claim of ineffective assistance of appellate counsel was

                                                   45

1    not contrary to or an unreasonable violation of the *Strickland* decision.  Accordingly, petitioner is

2    not entitled to federal habeas relief on that claim.

3         **B.  Jury Instruction Error**

4         Petitioner raises two claims of jury instruction error.  After setting forth the applicable

5    legal principles, the court will address these claims in turn below.

6              **1.  Applicable Legal Standards**

7         In general, a challenge to jury instructions does not state a federal constitutional claim.

8    *Engle v. Isaac*, 456 U.S. 107, 119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.

9    1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

10   'undesirable, erroneous, or even "universally condemned,"' but must violate some due process

11   right guaranteed by the fourteenth amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

12   The appropriate inquiry "is whether the ailing instruction . . . so infected the entire trial that the

13   resulting conviction violates due process." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)

14   (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

15   "[A] single instruction to a jury may not be judged in artificial isolation, but must be

16   viewed in the context of the overall charge." *Id.*  (quoting *Boyde v. California*, 494 U.S. 370, 378

17   (1990)) (internal quotation marks omitted).  "Instructions that contain errors of state law may not

18   form the basis for federal habeas relief." *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993).  Where the

19   challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially

20   heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a

21   misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 15 (1977).  *See also Villafuerte v.*

22   *Stewart*, 111 F.3d 616, 624 (9th Cir. 1997).

23   Because a failure to give a jury instruction is a trial error, petitioner is entitled to relief

24   only if he can show prejudice. *Dixon v. Williams*, 750 F.3d 1027, 1034 (9th Cir. 2014).  Prejudice

25   is shown for purposes of habeas relief if the trial error had a "substantial and injurious effect or

26   influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  A

27   reviewing court may grant habeas relief only it if is "'in grave doubt as to the harmlessness of an

28   error.'"  *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)).

1

### 2. Failure to Instruct on Attempted Voluntary Manslaughter

2          Petitioner claims that the trial court's failure to issue a jury instruction on the lesser-

3   included offense of attempted voluntary manslaughter violated his rights to trial by jury, due

4   process, and the effective assistance of counsel.  ECF No. 56 at 61.  He argues that the evidence

5   introduced at his trial supported such an instruction, and particularly evidence that both Powell III

6   and the people knocking on Powell Jr.'s bedroom door were "mad."  *Id.* at 61, 62.  Petitioner

7   argues that evidence all parties were "mad" could lead the jurors to find "that the anger

8   engendered a heat of passion that reduced the shooting from attempted second-degree murder to

9   attempted voluntary manslaughter."  *Id.* at 63.  Petitioner contends that the instruction was

10  required under California law.  *Id.*

11         Petitioner notes that the trial court considered the propriety of giving such a jury

12  instruction, as evidenced by the following colloquy:

13             THE COURT:  And another thing that disturbs me a little bit is
              there was a statement that came into evidence through Donnie
14            Powell, III involving an interchange, hearsay interchange, but it
              came into evidence without objection where Donnie Powell, III said
15            to Christy Scarbrough that his dad would be mad if they came in
              and Christy Scarbrough said that the two men with her were mad,
16            were already mad.  And I'm concerned that that may open the door
              for a heat of passion issue that would give a basis for a voluntary
17            manslaughter lesser-included defense.

18            MS. CARAWAY: (the prosecutor):  I think that sounds a little
              tenuous.
19
              * * *
20
              THE COURT:  Well, that certainly can be argued as tenuous, but
21            I'm worried about being reversed and not giving instructions that
              I'm required to give.
22
              I don't give them because I think they're going to be, create a
23            successful basis for a jury verdict for the lesser necessarily, but I
              don't want to be reversed by the Third DCA because I've failed to
24            give a lesser-included offense.

25            . . .

26            MS. CARAWAY:  I can certainly prepare an attempted voluntary
              manslaughter jury instruction.
27

28

1

2

THE COURT:  If that weren't in the record, I was ready to just go
forward without even giving it a second thought.  But if there's
evidence that they're mad, I have to think about that a little bit.

3       RT at 241.

4       The trial judge ultimately decided not to give the lesser-included offense jury instruction

5   because he didn't think there was sufficient evidence to support it.  *Id.* at 674, 675.  However, he

6   asked petitioner's trial counsel whether he was "asking" for the instruction.  Counsel responded

7   that he could not "point to any witness's testimony or any item of evidence that would justify a

8   requirement that it be given," that "there is nothing in the evidence that, that requires it to be

9   given," and that there was no "heat of passion."  *Id.* at 675-76.  However, "in an abundance of

10  caution and to protect the record" petitioner's trial counsel requested the instruction on the lesser

11  included offense of attempted voluntary manslaughter.  *Id.* at 674-75.  In the petition before this

12  court, petitioner claims that the trial court violated his federal constitutional rights in failing to

13  give this instruction, and that his trial counsel rendered ineffective assistance in failing to "make

14  an unequivocal request for the attempted voluntary manslaughter instruction."  ECF No. 56 at

15  62.[5]

16      The California Court of Appeal rejected these arguments, reasoning as follows:

17

18

19

20

Defendant contends the trial court erred when it refused his request
to instruct the jury on attempted voluntary manslaughter
(CALCRIM No. 602 [Attempted Voluntary Manslaughter: Heat of
Passion—Lesser Included Offense]) on the ground of insufficient
evidence to support that theory.  Defendant further contends his
trial counsel rendered ineffective assistance when he conceded,
"[n]o, there is no heat of passion, nothing like that."  Neither
contention has merit.

21

22

23

24

25

""""It is settled that in criminal cases, . . . the trial court must instruct
on the general principles of law relevant to the issues raised by the
evidence.  [Citations.]  The general principles of law governing the
case are those principles closely and openly connected with the
facts before the court, and which are necessary for the jury's
understanding of the case."  [Citation.]  That obligation has been
held to include giving instructions on lesser included offenses when

26

27

28

_____

        [5]  Petitioner notes that, during a break in deliberations, four jurors asked the bailiff "if
there is a lesser included charge."  ECF No. 56 at 62; CT at 255.  In response, the trial judge
drafted a jury instruction informing the jurors that it was "improper to communicate with the
bailiff about the case," that they were only to consider the charge of attempted second degree
murder, and that "there are no lesser included offenses."  CT at 255.

48

the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] . . .'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

"Malice is presumptively absent when a defendant kills 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), provided that provocation is sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from passion rather than judgment. [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1086.)

Defendant claims three pieces of evidence supported an attempted voluntary manslaughter instruction.  First, Spohr testified that the knocking on the bedroom door was very insistent and the men had refused to leave when Powell Jr. told Powell III to tell them he was busy.  Second, Scarbrough said the two men knocking on Powell Jr.'s bedroom door were mad.  Third, prosecution rebuttal evidence indicated that defendant could be aggressive and could become agitated quickly.

Whether viewed separately or in combination, this evidence simply suggested that defendant was mad and that, in this condition, he could become agitated and aggressive.  The evidence did not suggest that Powell Jr. had caused defendant's anger, or that Powell Jr. had committed provocative acts "sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from passion rather than judgment. [Citation.]" (*People v. Koontz, supra*, 27 Cal.4th at p. 1086; *see People v. Steele* (2002) 27 Cal.4th 1230, 1254.)  Defendant effectively concedes as much when he argues, in another context, that "the best inference from the record is that *[defendant] shot [Powell Jr.] suddenly, without warning, and without rhyme or reason.*"   (Italics added.)  Admittedly, the acts leading up to the shooting lacked sufficient "rhyme or reason" to "cause an ordinarily reasonable person to act rashly and without deliberation . . . ." (*People v. Koontz, supra*, 27 Cal.4th at p. 1086.)

Finally, no evidence suggested that defendant shot Powell Jr. in unreasonable or imperfect self-defense.  (E.g., *People v. Moye* (2009) 47 Cal.4th 537, 540.)

Because no evidence supported a voluntary manslaughter instruction, its refusal was not error. (*People v. Steele, supra*, 27 Cal.4th at p. 1254; *People v. Breverman, supra*, 19 Cal.4th at p. 154.)  Defendant's trial counsel was not ineffective for having candidly acknowledged that the requested instruction lacked evidentiary support.  "'"Trial counsel is not required to make futile objections, advance meritless arguments or undertake useless procedural challenges merely to create a record impregnable to assault for claimed inadequacy of counsel. [Citation.]"'" (*People v. Stratton* (1988) 205 Cal.App.3d 87, 97, quoting *People v. Jones* (1979) 96 Cal.App.3d 820, 827.)

*Dye*, 2011 WL 856424, **7 -8.

1    As explained above, federal habeas relief is not available for alleged error in the

2    application of state law, and habeas corpus cannot be utilized in federal court to try state issues de

3    novo. *Milton v. Wainwright*, 407 U.S. 371, 377 (1972); *see also Wilson*, 562 U.S. at 16;

4    *Waddington v. Sarausad*, 555 U.S. 179, 192 n.5 (2009) ("[W]e have repeatedly held that 'it is not

5    the province of a federal habeas court to reexamine state-court determinations on state-law

6    questions.'"); *Wood v. Ryan*, 693 F.3d 1104, 1115 (9th Cir. 2012).  Accordingly, the question of

7    whether the trial court violated state law in failing to give a lesser-included offense jury

8    instruction is not cognizable in this federal habeas proceeding.

9    The United States Supreme Court has held that the failure to instruct on a lesser included

10   offense in a capital case is constitutional error if there was evidence to support the instruction.

11   *Beck v. Alabama*, 447 U.S. 625, 638 (1980).  The Supreme Court has not decided, however,

12   whether this rationale also extends to non-capital cases.  The Ninth Circuit, like several other

13   federal circuits, has declined to extend *Beck* to find constitutional error arising from the failure to

14   instruct on a lesser included offense in a non-capital case.  *See Solis v. Garcia*, 219 F.3d 922, 929

15   (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a

16   state trial court to instruct on lesser included offenses in a non-capital case does not present a

17   federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of

18   a state court to instruct on a lesser offense fails to present a federal constitutional question and

19   will not be considered in a federal habeas corpus proceeding").  *See also United States v. Rivera-*

20   *Alonzo*, 584 F.3d 829, 834 n.3 (9th Cir. 2009) ("In the context of a habeas corpus review of a

21   state court conviction, we have stated that there is no clearly established federal constitutional

22   right to lesser included instructions in non-capital cases . . . .  On direct review, we have not

23   resolved whether there is a Constitutional right to a lesser-included instruction in noncapital

24   cases.")  Accordingly, the decision of the California courts denying petitioner relief as to this

25   claim was not contrary to United States Supreme Court authority as set forth in the *Beck* decision.

26   Further, to find a constitutional right to a lesser-included offense instruction here would require

27   the application of a new rule of law in the context of a habeas petition, something the court cannot

28   do under the holding in *Teague v. Lane*, 489 U.S. 28 (1989).  *See Solis*, 219 F.3d at 929 (habeas

1   relief for failure to instruct on lesser included offense in non-capital case barred by *Teague*

2   because it would require the application of a new constitutional rule); *Turner v. Marshall*, 63 F.3d

3   807, 819 (9th Cir. 1995), *overruled on other grounds* by *Tolbert v. Page*, 182 F.3d 677 (9th Cir.

4   1999) (en banc) (same).

5         In any event, this court agrees with the California trial and appellate courts that the

6   evidence introduced at petitioner's trial was insufficient to support a conviction for attempted

7   voluntary manslaughter.  As noted by the California Court of Appeal, the trial evidence

8   supported, at most, an inference that some of the people involved in this altercation, possibly

9   including petitioner, may have been "mad."  However, there was no specific evidence that

10   petitioner himself was angry at the victim, that petitioner shot the victim in the heat of passion,

11   that the victim provoked petitioner in any way, or that petitioner acted in self-defense.  Under

12   these circumstances, a jury instruction on attempted voluntary manslaughter was not supported by

13   the facts before the trial court.  Nor was petitioner's trial counsel ineffective in failing to argue

14   more forcefully for a jury instruction that was not supported by the facts of the case.  *See Jones v.*

15   *Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing *Boag v. Raines*, 769 F.2d 1341, 1344 (9th

16   Cir. 1985)) (an attorney's failure to make a meritless objection or motion does not constitute

17   ineffective assistance of counsel)).  *See also Matylinsky v. Budge*, 577 F.3d 1083, 1094 (9th Cir.

18   2009) (counsel's failure to object to testimony on hearsay grounds not ineffective where objection

19   would have been properly overruled); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the

20   failure to take a futile action can never be deficient performance").

21         The decision of the California Court of Appeal rejecting this claim of jury instruction

22   error is not contrary to or an unreasonable application of federal law.  Accordingly, petitioner is

23   not entitled to federal habeas relief.

24                   **3.  Erroneous Instruction on Murder**

25         Petitioner also claims that the giving of an erroneous jury instruction on implied malice

26   violated his right to due process of law and trial by jury.  ECF No. 56 at 16.  Petitioner notes that

27   implied malice is not an element of attempted second degree attempted murder, with which he

28   was charged.  *Id.* at 64.  He argues that although the trial court attempted to correct its mistake in

51

1    giving such a jury instruction, the correction came too late to cure the harm caused by the

2    erroneous instruction. *Id.* at 66.  Petitioner notes that the jurors were not instructed to begin

3    deliberations anew after the mistake had been corrected, nor were they instructed to disregard the

4    prosecutor's argument that the jury could find him guilty on a theory of implied malice. *Id.*  He

5    argues this contributed to the prejudice occasioned by giving the erroneous instruction.

6           The California Court of Appeal rejected this claim with the following reasoning:

> Defendant contends, and the Attorney General concedes, the trial
> court erred when it instructed the jury on implied malice, which is
> not an element of attempted murder.  The Attorney General claims
> the court rendered the error harmless when it admonished the jury
> to disregard that instruction, had the written instruction withdrawn
> from the instructions packet and returned to the court, orally
> instructed the jury with the correct instruction, furnished a correct
> written instruction for the instructions packet, and orally reiterated
> that attempted murder requires specific intent to kill.  Defendant
> replies that these efforts were not curative because they occurred
> slightly more than half way into the jurors' deliberations.   The
> Attorney General has the better argument.
>
> **Background**
>
> The prosecutor submitted a modified version of CALCRIM No.
> 600 (Attempted Murder).  To the pattern instruction's two elements,
> "[t]he defendant took at least one direct but ineffective step toward
> killing another person" and "[t]he defendant intended to kill that
> person," the prosecutor added a redundant and unnecessary third
> element, "[w]hen the defendant acted, he had a state of mind called
> malice aforethought."  Then, to define "malice aforethought," the
> prosecutor added the definitions of express and implied malice
> found in CALCRIM No. 520 (Murder With Malice Aforethought).
> The trial court reviewed the instruction and said it "looks fine."
> Later, in discussing the proposed instruction, the court noted that it
> incorporated malice aforethought.    Defense counsel said the
> instruction was acceptable.  With the prosecutor's permission, the
> court inserted the phrase "second degree" so the title and a
> succeeding reference read "attempted second degree murder."  The
> court confirmed that the prosecutor had included all language from
> the murder instructions dealing with the definition of malice,
> express and implied.  The court then said that it would give the
> instruction in the form submitted.  The jury was orally instructed as
> set forth below and received a written copy of the instructions for
> use during deliberations.[6]

_____

[6] The jury was instructed: "The defendant is charged in Count 1 with attempted second-
degree murder.  To prove the defendant guilty of attempted second-degree murder, the People
must prove that, number one, the defendant took a direct but ineffective step toward killing
another person; number two, the defendant intended to kill that person; *number three, when the
defendant acted he had a state of mind called malice aforethought.*

52

Jury deliberations began on September 28, 2009, at 11:28 a.m.; they were suspended for lunch at 11:45 a.m., and ended for the day at 4:10 p.m.  Before being released for the day, the jury submitted Jury Inquiry No. 3, seeking clarification of the instruction's phrase "intent to kill."[7]

Jury deliberations resumed the next morning at 8:35 a.m.  The trial court met with all counsel off the record regarding the jury's inquiry.

The inquiry caused the trial court to review the modified CALCRIM No. 600.  The court and prosecutor discussed whether it was appropriate to have instructed on malice aforethought. Ultimately, the court concluded that the implied malice instruction was improper and that it would correct its error by instructing the jury with an unmodified version of CALCRIM No. 600.

Defense counsel objected that the jury already had been instructed with the modified version, that they had been deliberating for hours, and that "we don't know what is exactly their focus."  He requested a mistrial, asserting damage may have been done that the correct instruction cannot remedy.  The court denied the request without prejudice to a motion for new trial.

---

"A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder.  A direct step is one that goes beyond planning or preparation and shows that a person is putting his plan into action. A direct step indicates a definite and unambiguous intent to kill.  It is a direct movement toward the commission of the crime after preparations are made.  It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted.

*"There are two kinds of malice aforethought.  Express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for attempted second-degree murder.*

*"The defendant acted with express malice if he unlawfully intended to kill.*

*"The defendant acted with implied malice, number one, if he intentionally committed an act; number two, the natural consequence of the act was dangerous to human life; number three, at the time he acted he knew this act was dangerous to human life; number four, he deliberately acted with conscious disregard for human life.*

*"Malice aforethought doesn't require hatred or ill will toward the victim.  It is a mental state that must be formed before the act is committed.  Does not require deliberation or the passage of any particular period of time."*  (Italics added.)

[7]    Jury Inquiry No. 3 stated: "Re [instruction] # 600 – we want clarification of 'intent to kill' – for instance examples [sic] – Is drawing a loaded gun intent?  Is there a definition, precise or otherwise?"

53

At 9:37 a.m., the trial court addressed the jury as follows: "I reviewed your question regarding instruction number 600.  Before I address your question, with respect to an instruction 600 that you had in your original packet, which has been returned to the Court, I will state to you as follows: In instructing upon the crime of attempt to commit murder that there should never [have] been any reference whatsoever to implied malice.  Nothing less than a specific intent to kill must be found before a defendant can be convicted of attempt to commit murder.  [¶]  I have redrafted 600 CALCRIM to reflect that requirement.  And I will read the correct instruction to you at this time and will admonish you to disregard the previous instruction, which you were given, which included a discussion of the concept of implied malice . . . ."  The court then instructed the jury in language that substantially conformed to the unitalicized portion of footnote 3, ante.  The court added, "And I will pass this instruction back to you to include in your packet as CALCRIM No. 600."

Then, after reading aloud the jury's written inquiry about "intent to kill" (fn.4, ante ), the trial court answered, "This is one of those uses of language which I've instructed you about where there is no specific legal definition to give and you're allowed to interpret the meaning of the words using their ordinary, everyday meaning in language. [¶] . . . [¶] [S]o the final answer to your question, ladies and gentlemen, is that an element required to convict of attempted second-degree murder is a specific intent to kill and you may analyze and interpret the phrase 'intent to kill' using your common sense and understanding of the everyday meaning of those words."[8]

At 9:43 a.m., the jury retired to continue its deliberations.  Thereafter, the trial court addressed defense counsel as follows: "And to return to your discussion of a mistrial[ ], I think that the Court's correction of the error with the comments draws enough attention to it to remedy any possible prejudice that may have been caused and there were no questions raised about the meaning of implied malice.  I don't even think they reached that point.  I think it was removed from their consideration in time before they even got to a discussion of implied malice.  So I think that the retraction of the original language and the institution of the correct language is enough to cure the problem, but I would give you an opportunity to place any further comments on the record regarding the mistrial motion."  Defense counsel was comfortable with the record as it was.

At 11:44 a.m., the jury took a short break.  The bailiff advised the trial court that, during the break, four jurors had commented to him about tension in the jury room and had inquired whether there was a lesser included offense to the charge.  The court responded by note that there were no lesser included offenses.  At 12:02 p.m., the court allowed the jury to deliberate during lunch.  At 1:32 p.m., the

---

[8]  Defendant correctly notes that attempted murder is not divided into degrees.  (*People v. Smith* (2005) 37 Cal.4th 733, 740; *People v. Bright* (1996) 12 Cal.4th 652, 669, *overruled on other grounds* in *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6.)

54

1
2
3

jury reported that it was unable to reach a verdict and were divided 11 to one. At 1:36 p.m., the jury resumed deliberations. At 1:41 p.m., at the court's request, the jury clarified that there were 11 votes for conviction and one for acquittal. At 2:56 p.m., the jury reached a verdict.

4

**Analysis**

5
6
7
8
9
10

Specific intent to kill is a requisite element of attempted murder, and implied malice is insufficient to sustain such a charge. (*People v. Smith, supra*, 37 Cal.4th at p. 739; *People v. Lee* (1987) 43 Cal.3d 666, 670, and cases cited therein.) "In instructing upon the crime of attempt to commit murder, there should never be any reference whatsoever to implied malice." (*People v. Santascoy* (1984) 153 Cal.App.3d 909, 918.) An erroneous reference to implied malice in an attempted murder case is federal constitutional error, which we assess pursuant to the "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711]. (*People v. Lee, supra*, 43 Cal.3d at pp. 669, 674–675.)

11
12
13
14
15
16

As noted, the Attorney General claims the trial court's error was harmless beyond a reasonable doubt in light of its admonishment to the jury to disregard the erroneous instruction; its having that written instruction withdrawn from the packet of instructions and returned to the court; its instructing the jury with the correct instruction; its furnishing the correct instruction for inclusion in the packet of instructions; and its reiteration that, in order to convict defendant of attempted murder, the jury must find that he acted with specific intent to kill.

17
18
19
20
21

Defendant replies that the error is not harmless, first, because the prosecutor "unambiguously told the jury" that he "could be convicted of attempted murder based on implied malice." In one passage, the prosecutor argued, "[t]here's also implied malice, which is an intentional act with the knowledge of a natural consequence dangerous to human life and that this act had conscious disregard for human life." In a later passage, the prosecutor remarked, "[e]ven if you were to apply implied malice, the intentional act of shooting someone in the head is certainly an act that has a natural consequence to human life."

22
23
24
25
26
27

The Attorney General responds that the instructions as a whole required the jurors to disregard both of these passages; we agree. At the outset, the trial court told the jury, "[i]f you believe that the attorneys' comments on the law conflict with the instructions, you must follow the instructions." During the reinstruction, the court told the jurors, "there should never [have] been any reference whatsoever to implied malice. Nothing less than a specific intent to kill must be found before a defendant can be convicted of attempt to commit murder." Thus, the jury was required to disregard both of the prosecutor's comments.

28

"Jurors are, of course, presumed to follow the instructions given by the court. [Citation.]" (*People v. McLain* (1988) 46 Cal.3d 97,

119–120 (*McLain*).)   In *McLain*, the court instructed the jury with former CALJIC No. 8.84.2, the "so-called Briggs Instruction," which was later held unconstitutional.   (*McLain, supra*, at p. 118; *see People v. Ramos* (1984) 37 Cal.3d 136.)   The Attorney General "argue[d] in substance that a supplementary charge, delivered by the court immediately after the Briggs Instruction, made that instruction nonerroneous or in any event nonprejudicial." (*McLain, supra*, at p. 119.)   The court agreed with only the latter argument, holding the erroneous use of the Briggs Instruction was harmless because, in the supplementary charge, "[t]he court thus directed the jurors to make no use of the Briggs Instruction in choosing the penalty." (*Ibid.*)

Unlike *McLain*, where the curative instruction followed immediately upon the heels of the erroneous instruction, the curative instruction in this case was delivered slightly more than halfway through the deliberative process (five hours 44 minutes versus four hours 41 minutes).   (*McLain, supra*, 46 Cal.3d at p. 119.)   Defendant argues this delay rendered the error prejudicial.   However, he cites no authority suggesting a curative instruction is effective only if delivered reasonably contemporaneously with the erroneous instruction.   Jurors routinely are instructed, following deliberations of any length, to discard all their prior discussions and to start over whenever a juror is replaced by an alternate.   In this case, there is no reasonable doubt about the jurors' ability to apply the curative instruction and to disregard any prior discussion of implied malice following nearly six hours of deliberation.   The guilty verdict was surely unattributable to comments by the prosecutor that merely reiterated the definition of implied malice ("[t]here's also implied malice, which is an intentional act with the knowledge of a natural consequence dangerous to human life and that this act had conscious disregard for human life") and voiced the tautological proposition that "the intentional act of shooting someone in the head is certainly an act that has a natural consequence to human life."   (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 189].)

Defendant claims the implied malice instruction was prejudicial in light of Scarbrough's statement to police that defendant "was telling [her] to calm down, and, uh, uh, it *slipped*, just thinking that, um, *he wasn't expecting it himself* either . . . ." (Italics added.)   We construe this passage as an assertion that the gun "slipped" in defendant's hand and he "wasn't expecting" it to slip or to fire.

Contrary to defendant's contention, his failure to expect that the gun would slip or fire does not tend to prove that he "acted with *conscious* disregard for human life" within the meaning of the implied malice instruction. (See fn. 3, *ante*; italics added .)   Rather, it tends to prove the opposite – that he was not conscious that the gun would slip or fire.   No juror who believed that defendant *did not intend to kill* would have convicted him, nevertheless, on the theory that his statement to Scarbrough established conscious disregard under the erroneous instruction.

56

1

2

3

4

> Defendant claims the error was prejudicial because, following its correction, four jurors inquired about lesser included offenses and one juror later held out for an acquittal.  The trial court opined that the jurors inquired because "anybody that has common sense has heard of an offense, . . . assault with a firearm.  Assault.  They're wondering why assault is not charged."

5

6

7

8

9

> If, as defendant suggests, the inquiry shows that four jurors believed that he "lacked the intent to kill," then their inquiry about lesser included offenses suggests that they were adhering to the court's admonition to disregard implied malice, which they otherwise might have considered and applied even without evidence of intent to kill.  The unanimous verdict hours later suggests, not that the jurors abandoned the admonition and resorted to implied malice, but that they followed the subsequent admonition that there were no lesser included offenses.  In sum, the instructional error was harmless beyond a reasonable doubt.

10

*Dye*, 2011 WL 856424, **3 -7.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In § 2254 proceedings, even if constitutional error is found a reviewing court must also assess the prejudicial impact of the error under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007); *Dixon v. Williams*, 750 F.3d 1027, 1034 (9th Cir. 2014).  Under *Brecht*, habeas petitioners are entitled to relief if "the error 'had substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at 637.  "Where the record is so evenly balanced that a judge 'feels himself in virtual equipoise as to the harmlessness of the error' and has 'grave doubt' about whether an error affected a jury [substantially and injuriously], the judge must treat the error as if it did so."  *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435–38 (1995)) (alteration in original).  After *Fry*, a habeas court must "apply the *Brecht* test without regard for the state court's harmlessness determination."  *Ayala v. Wong*, 756 F.3d 656, 674 (9th Cir. 2014) (quoting *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010)).  The United States Supreme Court has also held that "harmless-error analysis applies to instructional errors so long as the error at issue does not categorically 'vitiat[e] all the jury's findings.'" *Hedgpeth v. Pulido*, 555 U.S. 57 (2008).  *See also Neder v. United States*, 527 U.S. 1 (1999) (erroneous jury instruction that omits element of offense is subject to harmless-error analysis); *Johnson v. United States*, 520 U.S. 461, 469 (1997) ("improperly instructing the jury on an element of the offense . . . is subject to harmless-error analysis"); *California v. Roy*, 519 U.S. 2, 5 (1996) (error in jury instruction that

1   defined crime without including statement that jury was required to find that defendant had intent

2   to commit or facilitate crime had to be reviewed by habeas court under harmless error standard);

3   *Doe v. Busby*, 661 F.3d 1011, 1018-19 (9th Cir. 2011); *Byrd v. Lewis*, 566 F.3d 855, 863-64 (9th

4   Cir. 2009) (harmless error review applies to an instructional error that affects an element of the

5   offense, a permissible evidentiary inference, or a potential theory of conviction).

6       This court agrees with the California Court of Appeal that the jury instruction error that

7   occurred in this case was harmless.  When the trial court realized it had issued an incorrect jury

8   instruction, it informed the jury of the mistake, explained that "there should never [have] been

9   any reference whatsoever to implied malice," redrafted the instruction to eliminate reference to

10   implied malice, read the new instruction to the jury, and gave the new instruction to the jury in

11   written form.  The jury is presumed to have followed the newly drafted instruction, as well as the

12   trial court's admonitions.  *Kansas v. Marsh*, 548 U.S. 163, 179 (2006); *Richardson v. Marsh*, 481

13   U.S. 200, 206 (1987); *Fields v. Brown*, 503 F.3d 755, 782 (9th Cir. 2007).  In light of the trial

14   judge's actions after discovering the error, the original issuance of an incorrect jury instruction

15   would not have had a substantial and injurious effect or influence on the jury's verdict, even

16   though the error was not discovered until the jury had already begun its deliberations.

17       The decision of the California Court of Appeal that the jury instruction error that occurred

18   in this case was harmless is not contrary to or an unreasonable application of clearly established

19   United States Supreme Court precedent.  Accordingly, petitioner is not entitled to federal habeas

20   relief on this jury instruction claim.

21   **IV. Conclusion**

22       Accordingly, IT IS HEREBY RECOMMENDED that:

23       1.  Petitioner's April 6, 2015 motion for stay (ECF No. 82) be denied;

24       2.  Petitioner's April 6, 2015 motion for the issuance of a subpoena duces tecum be

25   denied; and

26        3.  Petitioner's application for a writ of habeas corpus be denied.

27       These findings and recommendations are submitted to the United States District Judge

28   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

1   after being served with these findings and recommendations, any party may file written

2   objections with the court and serve a copy on all parties.  Such a document should be captioned

3   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

4   shall be served and filed within fourteen days after service of the objections.  Failure to file

5   objections within the specified time may waive the right to appeal the District Court's order.

6   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

7   1991).  In his objections petitioner may address whether a certificate of appealability should issue

8   in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

9   2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

10   final order adverse to the applicant).

11   DATED:  September 9, 2015.

12                                                    EDMUND F. BRENNAN
                                                     UNITED STATES MAGISTRATE JUDGE

59